# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01719-COA

| | |
|---|---|
| **JEFFREY JACK STROH** | **APPELLANT** |

**v.**

| | |
|---|---|
| **NANCY JANE ZEHR STROH** | **APPELLEE** |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/18/2015 |
| TRIAL JUDGE: | HON. JOHN S. GRANT III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL J. MALOUF |
| | ROBERT E. JONES II |
| ATTORNEY FOR APPELLEE: | T. JACKSON LYONS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED IRRECONCILABLE DIFFERENCES DIVORCE, DIVIDED THE MARITAL ESTATE, AND AWARDED PERMANENT PERIODIC ALIMONY IN THE AMOUNT OF $750 PER MONTH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 06/27/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., FAIR AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Jeff and Nancy Stroh agreed to an irreconcilable differences divorce and agreed that the Rankin County Chancery Court would determine and distribute the marital estate and rule on Nancy's claim for alimony.  After a two-day trial, the chancellor entered an opinion and final judgment dividing the marital estate and awarding Nancy periodic alimony.  On appeal, Jeff alleges that the chancellor erred (I) by not including Nancy's residence in the equitable

distribution of the marital estate despite finding that the home was marital property; (II) by equally dividing the value of a tract of land referred to as "the Hill"; (III) by valuing the Hill at $106,000; (IV) by not accounting for a $7,000 debt incurred in connection with the parties' purchase of a sailboat; and (V) by awarding Nancy $750 per month in periodic alimony.

¶2. We reverse and remand for further proceedings consistent with this opinion as to issues (I) and (V). We find no error and affirm as to issues (II), (III), and (IV).

## FACTS AND PROCEDURAL HISTORY

¶3. Jeff and Nancy married on July 27, 2007. This was the second marriage for both Jeff, who was fifty-two years old at the time of the marriage, and Nancy, who was then forty-five years old. Jeff had two children from his prior marriage, which ended in divorce after twenty-six years. Nancy had two children from her prior marriage, which ended in divorce after sixteen years.

¶4. Prior to and during the marriage, Jeff owned two businesses in Pearl: Eldorado Storage LLC and Outdoor Graphics. Eldorado Storage is a storage rental business with seven storage buildings, five of which were constructed and being rented prior to Jeff's marriage to Nancy. The other two buildings were finished during the marriage but were 90% finished before the marriage. Outdoor Graphics is a small mailbox and sign production company that Jeff has operated since college.

¶5. Nancy was found to be disabled prior to her marriage to Jeff and began receiving Social Security disability payments. She worked sporadically prior to the marriage but not enough to support herself. After her marriage to Jeff, Nancy did some bookkeeping and

2

clerical work for Jeff's businesses, for which she was compensated. Nancy also managed the couple's finances.

¶6. When they were married, Jeff moved into Nancy's home. Jeff continued to own his prior residence in Pearl. During the marriage, Jeff performed maintenance and repair work at the marital residence. He cleared the back part of the three-acre lot of tree stumps and other growth, graded and landscaped the lot, maintained the swimming pool, and installed three pool pumps and a new pool liner. He also built and installed shutters, installed copper lanterns, and enclosed the back porch. Jeff and Nancy also substantially paid down the mortgage on the home during the course of the marriage. The evidence indicates that the parties made mortgage payments of approximately $70,000 during the course of the marriage. Nancy's Rule 8.05 financial statement estimated the value of her home at $250,000, with a mortgage balance of $13,671. Jeff estimated that the parties spent approximately $13,000 on improvements to the home (not counting his own labor) during the course of the marriage.

¶7. The parties never lived in Jeff's prior residence during the marriage. Instead, it was used as a rental property.

¶8. Jeff owned the property on which he built Eldorado Storage prior to the marriage. Adjacent to that property is a 2.45-acre lot that the parties refer to as "the Hill." When Jeff constructed and began operating Eldorado Storage, his mother, Joyce, owned the Hill. Joyce allowed Jeff to install sewer treatment lines on the Hill because sewer service was not available and there was no room to install lines on the Eldorado Storage property. Jeff

3

testified that Joyce permitted him to install sewer lines on the Hill because she intended to give him the property one day.[1]  Jeff described the system as consisting of sewer treatment lines and above-ground "spray heads" that spray out treated water in a thirty-foot radius.

¶9.     In 2007, after Jeff married Nancy, he offered to buy the Hill from Joyce, and she agreed to sell him the land for $21,000.  Jeff used funds from Eldorado Storage to make a $5,000 down payment and $300 monthly payments until the amount was paid in full in 2012.  Jeff's mother then conveyed the land to Jeff and Nancy as joint tenants with rights of survivorship.  Jeff and Nancy also successfully petitioned the City of Pearl to rezone the property as commercial property.  No improvements have been made to the Hill since Jeff's installation of the sewage treatment system.

¶10.    The Hill, the lots on which Eldorado Storage and Outdoor Graphics are located, Jeff's residence, Joyce's former residence, a vacant lot, and an approximately one-acre lot referred to as "the Boneyard" are all part of the same continuous tract of land along Eldorado Road and Summer Ridge Drive in Pearl.  Jeff purchased the Boneyard and the vacant lot prior to his marriage to Nancy.  This land has been in Jeff's family for a number of years.

¶11.    From the beginning of the marriage until approximately January 2013, Nancy assisted Jeff's business as a part-time bookkeeper.  At times, she also assisted him with accounts payable and in making various business decisions.  Nancy testified that she also "did everything at home so Jeff could come and go to work," i.e., "the laundry, the housekeeping, the cooking, the grocery shopping," etc.  She was also responsible for the couple's personal

---

[1] Joyce passed away after the parties separated but prior to trial.

4

banking and finances.

¶12. During the marriage, Jeff and Nancy purchased a Cape Dory Mark II sailboat for $14,000 in an online auction. Jeff and Nancy traveled to Maryland to get the boat and sailed for ten days before leaving it in North Carolina to be transported back to Mississippi. Testimony concerning the source of funds used to pay for the boat was unclear and conflicting. Nancy testified that she withdrew funds from her money market account to fund at least part of the purchase price, various upgrades, and/or the sailing trip. Jeff testified that he took out a home equity loan to pay for the boat and related expenses. On appeal, Jeff claims that he still owes $7,000 on that loan.

¶13. Jeff and Nancy separated on March 23, 2014. Jeff claimed that Nancy was the cause of the separation. He testified that Nancy constantly pressured him to put her name on separate assets that he had accumulated prior to the marriage, which he intended to leave to his sons. Jeff felt like Nancy was forcing him to choose between her and his sons, which Nancy denied. Nancy testified that she did not want to divorce Jeff and desired to reconcile long after he left her. Jeff left the marital home abruptly on March 23, 2014. He sent Nancy a text message to let her know that he wanted to separate and was leaving.

¶14. Nancy subsequently filed a complaint for separate maintenance, and Jeff answered and counterclaimed for divorce on the grounds of habitual cruel and inhuman treatment, or in the alternative, irreconcilable differences. On July 21, 2015, Jeff and Nancy filed a joint motion consenting to an irreconcilable differences divorce and to trial on specified issues. The chancellor signed an order granting the motion. In the motion, the parties stipulated that

5

"[e]ach party may retain use and ownership of their respective homes." They also submitted the following issues for decision by the court: (1) "[p]roperty rights between the parties"; (2) alimony, if any; (3) "[d]etermination of marital assets and equitable distribution of all assets of the marriage"; (4) "[r]esolution of differing valuations of property"; (5) determination and assignment of all marital debts; (6) "[d]istribution of the personal property of the marriage"; (7) any issues related to tax deductions, exemptions, refunds, or liabilities; (8) any assessment of costs and attorney's fees; and (9) whether any "marital waste" had occurred and any assessments for the same.

¶15. Trial was held on July 21-22, 2015. The chancellor issued a final judgment and opinion on September 18, 2015, which addressed all issues submitted by the parties. The chancellor found that Nancy's residence was marital property; however, he concluded that it was "not . . . subject to equitable division due to the agreement of the parties." The chancellor ruled that Jeff's residence, Eldorado Storage, Outdoor Graphics, the vacant lot, and the Boneyard were all Jeff's separate property. The chancellor found that the Hill was marital property and that it should be valued at $106,000. He ordered Jeff to pay Nancy $53,000 for her interest, plus $4,500 in rent payments received by Jeff after the parties' separation. The chancellor provided that Jeff could pay this amount in twenty-eight monthly installments of $2,000, plus a final installment of $1,500. The chancellor found that the Cape Dory sailboat was difficult to value, so he ordered Jeff to make Nancy an offer to purchase her interest in the boat, which Nancy would be free to accept or reject; however, if Nancy rejected Jeff's offer, she would be required to purchase Jeff's interest from him for the same

6

amount.[2] Finally, the chancellor awarded Nancy permanent periodic alimony of $750 per month. The chancellor's opinion included full *Ferguson*[3] and *Armstrong*[4] analyses.

¶16. Jeff filed a timely motion for reconsideration, which was denied, and a timely notice of appeal. On appeal, he raises the five issues listed above in ¶1, which concern Nancy's residence, the Hill, debt related to the Cape Dory sailboat, and alimony.

## ANALYSIS

¶17. "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review." *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003). "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id.* at 819 (¶53). However, on issues of law, our standard of review is de novo. *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).

¶18. "When this Court reviews a chancellor's judgment of property division we 'are to review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.'" *McKnight v. McKnight*, 951 So. 2d 594, 596 (¶6) (Miss. Ct. App. 2007) (quoting *Wells v. Wells*, 800 So. 2d 1239, 1243 (¶8) (Miss. Ct. App. 2001)). "Alimony awards are [also] within the discretion of the chancellor, and his discretion will not be reversed on appeal unless [he] was manifestly in error in his finding of fact and abused his

---

[2] The chancellor used the same basic method to address the parties' other sailboat, their motorcycle, and their golf cart.

[3] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

[4] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

discretion." *Armstrong*, 618 So. 2d at 1280. However, "[i]f we find . . . that the court applied an erroneous legal standard, we will not hesitate to reverse." *Id.*

¶19. For the reasons discussed below, we hold that the chancellor erred by excluding Nancy's residence from the equitable distribution analysis and by excluding consideration of lump-sum alimony, as opposed to periodic alimony. Therefore, we remand for further proceedings consistent with parts I and V of this opinion. Otherwise, we find no error in the chancellor's thorough opinion and final judgment.

## I. Nancy's Residence

¶20. As noted above, the chancellor found that Nancy's residence was marital property. However, he then ruled that the home was "not . . . subject to equitable division due to the agreement of the parties." In Jeff's subsequent motion for reconsideration, Jeff argued that the chancellor's ruling misunderstood the parties' agreement. Jeff argued that although the parties stipulated that they would retain ownership of their respective residences, they intended that any contributions that they made to each other's residence would be considered in the court's equitable distribution analysis. At the hearing on his motion, Jeff's attorney again argued that the parties' agreement permitted the court to consider the houses in the equitable distribution analysis, and he also pointed out that each party put on proof as to his or her contributions to the other party's home. When the chancellor asked counsel for Nancy whether he wanted to respond to any of Jeff's arguments, counsel did not address Jeff's contention; rather, he simply stated that he had no response unless the chancellor wanted him to address some particular issue. At the conclusion of the hearing, the chancellor stated that

8

he "did consider the contributions that each of the parties made to the other's home," but as to the improvements that Jeff made to Nancy's home, he "heard not one scintilla of evidence . . . to show in any way how that enhanced the market value of [Nancy's home]." The chancellor continued,

> Sure, he contributed to helping the property become more comfortable, more attractive. He put shutters on the house, as I recall. He did some things to improve the appearance of the house, to perhaps modernize it, or at least to make it more attractive; and I know that he did these things. At the same time, there is no way to calculate what that sweat equity was worth, whether it made it more valuable, or . . . what, if any, increase it afforded the property . . . . How can I give him a contribution when I can't evaluate it?

¶21. On appeal, Jeff again argues that the chancellor misconstrued the parties' agreement. He also argues that the law does not require him to prove that his improvements to Nancy's home "made it more valuable." In response, Nancy maintains that the chancellor correctly interpreted the parties' agreement and, in the alternative, "that it was Jeff's job . . . to show the value of the home . . . when the parties married, and the value of the home at the time of the divorce." "Only then," Nancy continues, "could the trial court realistically entertain an equitable division of the increased value."

¶22. As to the first point, we agree with Jeff that the parties' agreement did not preclude equitable distribution of the value of the home. The parties agreed that each would "retain *use and ownership* of their respective homes." (Emphasis added). The parties then agreed that the court would determine which assets were "marital assets" and then make an "equitable distribution of *all* assets of the marriage." (Emphasis added). We do not interpret their stipulation that Nancy would retain "use and ownership" as precluding equitable

9

division of this marital asset and a concomitant award to Jeff. To illustrate this point, as part of the final judgment, the chancellor awarded Jeff "sole possession" and "sole ownership of the Hill"; however, as part of his equitable distribution of the marital assets, he also awarded "Nancy . . . the amount of $53,000, half of the value of the Hill." The same could have been done with Nancy's residence, a marital asset. That is, although Nancy was entitled to retain sole ownership of the home, this in no way precluded the chancellor from awarding Jeff some part of its value as part of the equitable distribution of the marital assets.

¶23. As to the second point—the proof necessary to support an equitable division of the property—we also disagree with Nancy that Jeff was required to show that his physical improvements to the home increased its market value. Even setting aside any improvements to the home, Jeff presented evidence that approximately $70,000 in mortgage payments were made on the home during the course of the marriage. Nancy does not dispute that these payments were made, and Nancy's Rule 8.05 statement estimated the value of the home at $250,000, with a remaining mortgage balance of only $13,671. Obviously, a material part of the equity in the home was built up with marital funds. Jeff is at least entitled to some consideration for equity accumulated with marital funds.

¶24. This does not mean that Jeff is entitled to a dollar-for-dollar credit for mortgage payments made during the marriage. To begin with, the payments were made from marital funds, not Jeff's separate funds.[5] Moreover, some part of the mortgage payments obviously

_____

[5] Although the mortgage payments were made from a joint account, each party seems to believe that he or she is entitled to full and exclusive credit for them. In her testimony at trial, Nancy seemed to insist that the mortgage payments were made solely from her Social Security disability payments or some other source that she considered hers and hers alone,

went toward interest, which may be viewed as an ordinary living expense, rather than accumulation of equity (an asset). However, as the chancellor found, the asset is a marital asset, and it was acquired in part with marital funds. Just as the Hill was a marital asset, and the chancellor found that Nancy was entitled to part of its value in the equitable distribution, *see infra*, the chancellor should have considered whether Jeff was at least entitled to some part of the value of home equity, a marital asset, accumulated through mortgage payments made with marital funds. In general, "a spouse who has made a material contribution toward the acquisition of property which is titled in the name of the other may claim an equitable interest in such jointly accumulated property incident to a divorce proceeding." *Ferguson*, 639 So. 2d at 935 (quoting *Jones v. Jones*, 532 So. 2d 574, 580 (Miss. 1988)).

¶25. As to any improvements, the chancellor did not clearly err by finding that there was insufficient evidence that Jeff's work on the house resulted in any significant increase in its value. Also, although Jeff seeks credit for "grading the lot to avoid flooding of the house," Nancy testified that Jeff's rerouting of the water has actually caused significant erosion to her backyard and damage to her deck and pool, which will require expensive repairs. Nancy

---

notwithstanding that this would have consumed most or all of "her" income and left Jeff to pay all of the couple's other living expenses from "his" income. In contrast, Jeff seems to argue that he paid the mortgage because most of the couple's income was derived from his work at his businesses. There is no support in the evidence or the law for either party's position. *See Bowen v. Bowen*, 982 So. 2d 385, 395 (¶41) (Miss. 2008) ("Domestic services and economic services have equal value."); *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994) ("We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value."). The evidence simply shows that the mortgage was paid out of marital funds from a joint account. *See Sanderson v. Sanderson*, 170 So. 3d 430, 438 (¶26) (Miss. 2014) (holding that funds deposited into a joint account for familial use are treated as marital funds).

11

claimed that her home was in need of more than "$50,000 worth of serious repairs." The chancellor is also free to take this testimony and evidence into account on remand, to the extent it is credible.

¶26.    In summary, the parties' agreement did not preclude equitable distribution of the value of Nancy's house, a marital asset. Nor was Jeff required to prove that his repairs or improvements to the property increased its market value. On remand, Jeff is, at minimum, entitled to some consideration for mortgage payments made with marital funds.

## II.    Equitable Division of the Hill

¶27.    Jeff argues that the chancellor improperly categorized the Hill as a marital asset and, in the alternative, that Nancy was not entitled to half the value of the property even if it is deemed a marital asset. The law presumes that all property acquired or accumulated during marriage is marital property. *Hemsley*, 639 So. 2d at 914. This presumption may be rebutted only if "it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Id.* "The burden of proof is on the spouse claiming property as separate to rebut this presumption." *Rhodes v. Rhodes*, 52 So. 3d 430, 441 (¶42) (Miss. Ct. App. 2011).

¶28.    The history of the Hill is discussed above. Jeff and Nancy acquired the Hill from Jeff's mother, Joyce, who had previously permitted Jeff to install sewage treatment lines on the property. Jeff testified that, a few months after their marriage, Nancy suggested that it was time for him to buy the Hill from Joyce, so they approached her about buying the lot. Joyce sold Jeff and Nancy the lot for $21,000, the amount she had paid for it. Jeff testified

12

that he believed this was a family discount and that the value of the property was probably closer to $30,000. The purchase price consisted of a $5,000 down payment, plus payments of $300 per month until the balance was paid in 2012. Joyce then deeded the land to Jeff and Nancy "[a]s joint tenants with full rights of survivorship and not as tenants in common."

¶29. Jeff testified that his mother had already agreed to eventually give him the Hill, either by deed or at her death, as far back as 1999, when he installed the sewer lines on the property. Jeff also claims that the land has no real value or use other than as a location for sewer lines for Eldorado Storage. He also claims that the money paid to his mother for the property came from Eldorado Storage, and since the chancellor found that business to be his separate asset, the funds from it must be separate as well. Thus, Jeff argues, Nancy has no real connection to the property or his acquisition of it other than her name on the title. He claims that he agreed to allow her name to be placed on the deed only as a show of his commitment to her.

¶30. The chancellor did not commit clear or manifest error by finding that Jeff failed to rebut the presumption that the Hill was marital property. Nancy urged Jeff to purchase the Hill, and she assisted in the process of petitioning to have the property rezoned. All payments for the Hill were made during the marriage, and the Hill was deeded to Jeff and Nancy as joint tenants with full rights of survivorship. Moreover, although the Hill is closely tied to Jeff's business, Nancy presented evidence that she assisted in the business during the marriage, including as a bookkeeper. And although Jeff testified that payments on the Hill were made out of funds held by Eldorado Storage, those funds could have been paid out to

13

him as income, for the benefit of the marital household, had they not been used instead to purchase the Hill. "As the [S]upreme [C]ourt has repeatedly discussed, the relationship between a wage-earning spouse and a homemaking spouse is symbiotic. We presume that the efforts of each make the contributions of the other possible." *Hankins v. Hankins*, 866 So. 2d 508, 512 (¶20) (Miss. Ct. App. 2004) (citing *Hemsley*, 639 So. 2d at 915).

¶31. Jeff also argues that the chancellor erred in his equitable distribution by awarding Nancy one-half the value of the Hill. Jeff is correct that "an equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). "The intent of equitable distribution is to assure that after taking into account all relevant factors, including the separate estates of the parties, the contributions of each party toward the accumulation of the marital estate, and the needs of each party, to the extent reasonably possible, each party is given sufficient assets to accommodate his needs." *Wideman v. Wideman*, 909 So. 2d 140, 144 (¶14) (Miss. Ct. App. 2005) (citing *Ferguson,* 639 So. 2d at 921).

¶32. In support of his argument that half was too much, Jeff relies on *Stewart v. Stewart*, 864 So. 2d 934, 939 (¶¶16-18) (Miss. 2003), in which our Supreme Court held that the chancellor did not abuse his discretion by awarding the wife twenty percent of the insurance proceeds and proceeds from the sale of the residential lot after the former marital home was destroyed in a fire. In *Stewart*, the husband argued that twenty percent was too much and that the wife had contributed too little to deserve any credit for the home. *Id.* The Supreme Court rejected this argument and affirmed. *Id.* at (¶18).

14

¶33. Jeff's reliance on *Stewart* is misplaced. To begin with, the facts of *Stewart* are readily distinguishable.[6] Moreover, the Supreme Court's affirmance of an award of twenty percent in one case hardly implies that an award of a larger percentage would be an abuse of discretion in another case—let alone in a quite different case. For the same reasons discussed above, the chancellor did not clearly or manifestly err by awarding Nancy one-half the value of the Hill.[7] As we have noted, Nancy made some contributions to Jeff's business and was involved in the acquisition and rezoning of the Hill, Jeff admitted that she provided domestic services throughout the marriage, and the property was purchased and paid for during the course of the marriage. Given these facts, the chancellor did not err by concluding that she should be awarded one-half the value of the Hill.

### III.    Valuation of the Hill

¶34. Jeff next claims that the chancellor erred by finding that the Hill should be valued at $106,000. The chancellor's valuation is the average of Jeff's estimate of the property's value and the estimate of Barr Biggs. Biggs is a licensed commercial real estate appraiser whom Nancy tendered and the court accepted as an expert witness. Jeff did not object to Biggs's expert testimony.

¶35. Jeff estimated that the property was worth $32,000 when he bought it from his mother, admitting that his mother "cut him a good deal" and that the land was even then worth

---

[6] The marriage in *Stewart* lasted barely a year before the parties separated and the wife filed for divorce. *See id.* at 936 (¶¶2-4).

[7] We also note that the chancellor permitted Jeff to pay Nancy for her interest in the Hill over a period of twenty-nine months, without interest. Therefore, in real terms, the chancellor actually awarded Nancy slightly less than half the value that he placed on the Hill.

somewhat more than its $21,000 purchase price. Jeff testified that his mother had purchased the land for $21,000, which apparently occurred many years earlier. The chancellor found this value to be "unreasonably low." He reasoned that the purchase was not an arm's-length transaction and that Jeff and Nancy benefitted from a family deal. Jeff's mother was already allowing him to use the property and intended to leave it to him at her death. The chancellor also noted that the land was later rezoned commercial.

¶36. Biggs valued the property at $180,000 based on (what he considered) comparable sales and listings. However, with substantial support in the record, the chancellor found that Biggs's estimate was not "particularly accurate." Biggs did not realize that sewer service was not available on the Hill or that it lacked Stage 3 electrical power, which would be necessary for most industrial purposes. Biggs also did not seem to realize that the sewage treatment system on the property, including "spray heads," would limit its uses. For these reasons, the other sales and listings relied on by Biggs were not meaningful comparables.

¶37. The chancellor considered testimony that the nearby "Eldorado Steakhouse property" had been listed at $165,000, although it had been for sale for several years and had not sold. That property was described as three-plus acres with a steakhouse and two other buildings. Jeff believed that the steakhouse property was a more attractive property than the Hill; Biggs was cross-examined about the property but was not familiar with it. We also note that on cross-examination, Nancy testified that she was willing to accept $50,000 for her interest in the Hill or would pay Jeff $50,000 for his interest, stating "what's good . . . for the goose is good for the gander, I'll take that offer."

16

¶38. In valuing marital property, the chancellor may rely on appraisals, values cited in the parties' disclosures or testimony, or any other competent evidence. *See Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011). "[I]t is not the chancellor's duty to obtain appraisals of the marital property," *id.* at (¶21), or, as in this case, to obtain a new appraisal when the only one offered is shown to be unreliable. As this Court has observed, a "chancellor[] faced with proof from both parties that [is] something less than ideal, [must make] valuation judgments that find some evidentiary support in the record." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (¶28) (Miss. Ct. App. 1999). The chancellor is not expected or even permitted to go outside the record to look for better evidence. *See Pruitt v. Pruitt*, 144 So. 3d 1249, 1253 (¶11) (Miss. Ct. App. 2014). "To the extent that the evidence on which the chancellor base[s] his opinion [is] less informative than it could have been, we lay that at the feet of the litigants and not the chancellor." *Dunaway*, 749 So. 2d at 1121 (¶28).

¶39. In this case, the chancellor did not clearly or manifestly err in valuing the Hill as he did in light of the evidence presented to him by the parties. The chancellor reasonably found that Jeff's estimate was too low and that Biggs's was too high. He found that both failed to take into account certain important facts. We also note that the chancellor's ultimate valuation was generally consistent with the listing price of the nearby Eldorado Steakhouse property, and it was consistent with what Nancy testified that she would be willing to pay *or* accept for a half-interest in the property. Based on the evidence presented, we find no

17

reversible error in the chancellor's valuation of the property.[8]

### IV. Alleged Sailboat Debt

¶40. Jeff next argues that the chancellor failed to account for $7,000 debt remaining related to the Cape Dory Mark II sailboat, a marital asset. As noted above, the chancellor addressed the boat by directing Jeff to make an offer to Nancy for her interest in it, and then providing that if Nancy rejected Jeff's offer, she would be required to purchase Jeff's interest for the same amount. The chancellor used this approach because it was difficult to value the boat based on the evidence that the parties presented. Jeff does not object to the chancellor's method of dealing with the boat, but he argues that the chancellor should have addressed the remaining debt as well. Jeff maintains that debt at issue is $7,000 remaining on a home equity loan (on his separate home) that he took out to help buy the boat.

¶41. The evidence was all less than clear as it related to the funds used to purchase the boat, the trip to get the boat, and related add-ons and expenses. It appears that both parties may have contributed some previously separate funds toward the boat and related expenses. Jeff's brief on appeal cites two pages of his trial testimony where he mentioned taking out a home equity loan to buy the boat but provided no specifics about the loan or its remaining balance. Most of the cited passage consists of Jeff's rehashing of marital squabbles over money. Jeff's brief on appeal also cites his Rule 8.05 statement, but it merely shows a

---

[8] Jeff also argues that if the Hill is truly worth $106,000, then its value in excess of its purchase price ($106,000 – $21,000 = $85,000) was a gift from his mother to him and, thus, separate property. This argument might have merit if the excess value could be characterized as a gift from Jeff's mother *to Jeff*. *See Rhodes*, 52 So. 3d at 441 (¶40). However, if there was a gift, it was a gift to Jeff *and Nancy*, as joint tenants with rights of survivorship, not Jeff alone.

18

$15,000 "Mortgage Balance" on his home without additional detail or explanation. Finally, in his post-judgment motion for reconsideration, Jeff argued that the chancellor should amend the judgment to account for his "outstanding home equity loan for $12,000."

¶42.   Given the lack of evidence regarding this loan, we cannot find that the chancellor committed any clear or manifest error or abused his discretion by denying Jeff's post-judgment motion on the issue.  The record does not clearly show the nature of this debt or its remaining balance.  Indeed, we cannot find in the record the $7,000 figure that Jeff uses on appeal.  Morever, the loan is secured by Jeff's prior residence, which he successfully argued was his separate property.  Jeff failed to prove the amount or existence of an additional martial debt, and the chancellor committed no reversible error.

## V.    Alimony

¶43.   Alimony should be considered only if, after the parties assets are equitably divided, there are not "sufficient assets to provide for both parties" and one party is left with "a deficit." *Carter v. Carter*, 98 So. 3d 1109, 1112 (¶8) (Miss. Ct. App. 2012).  "[T]he 'deficit' to which our cases refer is not one spouse's receipt of assets with a lesser net value than those allocated to the other spouse." *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015).  "Rather, the question is whether the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Id.* (emphasis removed) (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)).  An award of alimony will be reversed if it is an abuse of discretion or if it is premised on a clear error or "an erroneous legal standard." *Armstrong*, 618 So. 2d

at 1280.

¶44.     Mississippi law recognizes four types of alimony: periodic, lump-sum, rehabilitative, and reimbursement.  *Smith v. Little*, 834 So. 2d 54, 57 (¶9) (Miss. 2002).  Only periodic and lump-sum alimony are relevant to this appeal.  Periodic alimony is awarded on the basis of need, generally in monthly installments.  *Id.*  It has no fixed termination date but automatically terminates upon the remarriage of the recipient or death of the payor.  *Id.*  It can be modified or terminated in the event of a material change of circumstances for either party.  *Id.*  "The chancellor must consider . . . the *Armstrong* factors in . . . determining whether to award alimony [and] the amount of the award[.]"  *Steiner v. Steiner*, 788 So. 2d 771, 776 (¶16) (Miss. 2001).

¶45.     Lump-sum alimony, in contrast, "is a fixed and irrevocable amount, used either as alimony or as a part of property division."  *Smith*, 834 So. 2d at 58 (¶10).  It may be payable as a single, lump sum (as its name implies) or in fixed periodic installments.  *Id.*  "Lump-sum alimony has been described as a means of adjusting financial inequities that remain after property division."  *Lewis v. Pagel*, 172 So. 3d 162, 176 (¶29) (Miss. 2015) (quoting *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶12) (Miss. 2011) (quotation marks omitted)).  It "is intended as an equalizer between the parties to serve equity amongst them *completely once and for all*."  *Hubbard v. Hubbard*, 656 So. 2d 124, 130 (Miss. 1995) (emphasis added).  "[W]hen 'lump-sum alimony is awarded as a mechanism to equitably divide the marital assets, then chancellors may conduct their analysis under the *Ferguson* factors.'"  *Lewis*, 172 So. 3d at 176 (¶29) (quoting *Davenport v. Davenport*, 156 So. 3d 231, 241 (¶34) (Miss.

2014)). However, when a "chancellor awards lump-sum or periodic alimony *after* equitably dividing the estate, the chancellor should consider the *Armstrong* factors." *Id.* (emphasis added).

¶46. The Supreme Court has also held that a chancellor may exercise his discretion to award appropriate lump-sum alimony in lieu of periodic alimony. *Pearson v. Pearson*, 761 So. 2d 157, 166 (¶28) (Miss. 2000). The chancellor "has great discretion in determining the amount and type of alimony, *and should do so in a way to bring finality to the economic relationship of the parties*, as justice and equity require." *Id.* (emphasis added).

¶47. In the present case, citing *Cheatham v. Cheatham*, 527 So. 2d 435, 438 (Miss. 1988), the chancellor found that lump-sum alimony would be "inappropriate" because it is "[t]ypically . . . awarded in situations when spouse quits working to become a homemaker or substantially contributes to the business of the other spouse." The chancellor further concluded that "[n]either of those situations applies here."[9] The chancellor then analyzed the *Armstrong* factors and concluded that permanent periodic alimony in the amount of $750 per month would be appropriate.

¶48. Jeff argues that the chancellor erred by awarding Nancy permanent periodic alimony in the sum of $750 per month, particularly given that he and Nancy were married for less than seven years before they separated. He also argues that the chancellor erred by failing to consider lump-sum alimony.

---

[9] At the hearing on Jeff's motion for reconsideration, the chancellor reiterated that lump-sum alimony was inappropriate because Nancy did not quit work to become a homemaker or contribute substantially to Jeff's business.

¶49. We agree with Jeff that the chancellor erred to the extent that he held that *Cheatham* precluded an award of lump-sum alimony, in lieu of periodic alimony, in this case. The Supreme Court recently reiterated that "the *Cheatham* factors were simply an earlier attempt by [the] Court to provide a chancellor with guidelines for awarding what today is called an equitable distribution of marital assets, under appropriate circumstances." *Carney v. Carney*, 201 So. 3d 432, 442 (¶35) (Miss. 2016) (quoting *Haney v. Haney*, 907 So. 2d 948, 955 (¶26) (Miss. 2005)). The *Cheatham* factors do not preclude an award of lump-sum alimony that is intended to serve a function similar to periodic alimony. *See Lewis*, 172 So. 3d at 176 (¶29).[10] And our Supreme Court has held that when a "chancellor awards *lump-sum or periodic alimony* after equitably dividing the estate, the chancellor should consider the *Armstrong* factors." *Carney*, 201 So. 3d at 442 (¶35) (emphasis added) (quoting *Lewis*, 172 So. 3d at 176 (¶29)). Put simply, the *Cheatham* factors do not preclude an award of lump-sum alimony, in lieu of periodic alimony, in appropriate cases. *Lewis*, 172 So. 3d at 176 (¶29).[11]

¶50. Jeff also argues that the chancellor erred by awarding periodic alimony given that the marriage was not a long one. The chancellor cited *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1995), for the proposition that seven years was "a sufficiently long marriage to award alimony." However, in *Creekmore*, the Supreme Court held that "[t]he duration of seven years is long enough to qualify for an award of *lump sum alimony*." *Id.* (emphasis

---

[10] The Supreme Court decided both *Carney* and *Lewis* after the trial in this case.

[11] This Court recently affirmed such an award. *See Farris v. Farris*, 202 So. 3d 223, 235-36 (¶¶44-48) (Miss. Ct. App. 2016).

22

added). With that observation, we do not hold that the length of the parties' marriage precluded an award of periodic alimony or that any award of periodic alimony would be an abuse of discretion on the facts of this case. We simply hold that the award of alimony should be reconsidered on remand (a) with the understanding that the law would permit an award of lump-sum alimony on the facts of this case and (b) in light of any changes to the equitable division of the marital estate.[12] The chancellor should also consider whether an award of lump-sum alimony would be sufficient to address any deficit and might "do so in a way to bring finality to the economic relationship of the parties, as justice and equity require." *Pearson*, 761 So. 2d at 166 (¶28).

## CONCLUSION

¶51. The chancellor erred by interpreting the parties' agreement to prohibit an equitable division of Nancy's residence and by ruling that the law would not permit an award of lump-sum alimony (rather than periodic alimony) on the facts of this case. We reverse and remand for further proceedings consistent with parts I and V of our opinion addressing these two issues. Aside from these two issues, we find no reversible error and affirm.

¶52. **THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.**

---

[12] Alimony and equitable distribution are distinct concepts but generally must considered together by the court in the financial settlement of a divorce. *See Ferguson*, 639 So. 2d at 929. Therefore, "[o]rdinarily, the reversal of a chancellor's division of marital property requires reversal of an alimony award." *Hearn v. Hearn*, 191 So. 3d 129, 133 (¶17) (Miss. Ct. App. 2016).

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**