# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00903-COA

**MARTHA COLLINS**                                                          **APPELLANT**

**v.**

**JUSTIN COLLINS**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/22/2022 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | WILLIAM CARL MILLER |
| ATTORNEY FOR APPELLEE: | DEAN HOLLEMAN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 04/09/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     In 1988, Justin and Martha Collins were granted an irreconcilable differences divorce and entered into a property settlement agreement (PSA) that required Justin to pay periodic alimony that would increase annually.  In 1992, Martha entered into a "de facto marriage," and Justin stopped paying alimony.  Nearly thirty years later, after her longtime companion passed away, Martha filed a contempt action against Justin to recover unpaid alimony.  The chancellor granted summary judgment in favor of Justin, holding that Martha's de facto marriage terminated her right to receive alimony.  We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Justin and Martha were granted an irreconcilable differences divorce in 1988.[1]  Their

PSA, which the chancellor approved and incorporated into the final divorce decree, required

Justin to pay permanent alimony in increasing amounts as follows:

| | |
|---|---|
| 1988: | $225 every two weeks |
| 1989: | $300 every two weeks |
| 1990: | $375 every two weeks |
| 1991: | $450 every two weeks |
| 1992: | $525 every two weeks |
| 1993: | $600 every two weeks |

The PSA provided that in 1994 and every year after, Justin's biweekly payment would

increase by $25.  Thus, if the obligation remained in effect, Justin would have been required

to pay Martha $1,275 every two weeks by the time Martha commenced this action in 2020.

The PSA also required Justin to pay an additional $1,000 on May 1 each year.  The PSA

required Justin to pay alimony until Martha "remarrie[d] or either party die[d]."

¶3.     Justin stopped paying alimony in 1992 when he became aware that Martha was in a

"de facto marriage" with Leonard Froyum.  From 1992 to 2020, Martha never asked Justin

for alimony or even mentioned the issue to him.  Froyum passed away in 2016, and his

obituary identified Martha as his "long-time companion."[2]

¶4.     In December 2020, Martha filed a complaint for citation of contempt against Justin

for nonpayment of alimony.  In interrogatory responses, Martha admitted that she and

Froyum began a romantic relationship in 1992 and cohabited until his death in 2016.  In

---

[1] The record does not reflect the date the parties married.

[2] As the chancellor noted, Froyum's obituary "recognized [Martha] before even . . .
identifying . . . his own children."

2

March 2022, Justin filed a motion for summary judgment, arguing that his alimony obligation terminated when Martha entered into a "de facto marriage" with Froyum. Justin also argued that Martha's claim was barred by laches.

¶5.     At the hearing on Justin's motion, Martha's attorney expressly "admit[ted] that there was a de facto marriage," that Justin was entitled to "summary judgment as to the issue of de facto marriage," and that Justin could not be required to prospectively pay alimony. Martha also acknowledged that if she had actually entered into a legal marriage, Justin's obligation to pay alimony would have automatically terminated. However, Martha argued that because Justin never filed a motion to terminate alimony, her right to the payments continued to vest as they came due and could not be retroactively terminated. Martha conceded that a seven-year statute of limitations governed her claim and that she could not recover payments due more than seven years before she filed her complaint.[3]

¶6.     The chancellor granted Justin's motion for summary judgment, holding that there were no genuine issues of material fact and that Martha was not entitled to recover any past-due alimony. The chancellor reasoned that Martha's admitted de facto marriage automatically terminated her right to alimony. The chancellor also held that the doctrine of laches barred Martha's claim due to her long delay in asserting her claim. Martha filed a motion for reconsideration, which the chancellor denied, and a notice of appeal.

## ANALYSIS

---

[3] *See Siders v. Zickler*, 312 So. 3d 1224, 1231 (¶¶23-24) (Miss. Ct. App. 2021) (holding that a seven-year statute of limitations governs alimony obligations under a property settlement agreement that is incorporated into a divorce decree).

¶7.     On appeal, Martha argues the chancellor erred by holding that her de facto marriage and the doctrine of laches barred her claim. We agree with the chancellor that Martha's admitted de facto marriage precluded her from recovering alimony.[4] Because we affirm on that ground, it is unnecessary to address the doctrine of laches.

¶8.     "Periodic alimony is awarded on the basis of need, generally in monthly installments." *Stroh v. Stroh*, 221 So. 3d 399, 412 (¶44) (Miss. Ct. App. 2017). "It has no fixed termination date but *automatically* terminates upon the remarriage of the recipient . . . ." *Id.* at 412-13 (¶44). The remarriage of the recipient terminates the payor's obligation automatically—the payor is not required to file a motion to terminate alimony. *See Boren v. Windham*, 425 So. 2d 1353, 1355-56 (Miss. 1983); *Bridges v. Bridges*, 217 So. 2d 281, 283 (Miss. 1968); *East v. Collins*, 194 Miss. 281, 289, 12 So. 2d 133, 135 (1943); *Sides v. Pittman*, 167 Miss. 751, 755-56, 150 So. 211, 211-12 (1933); *Hollis v. Baker*, 107 So. 3d 1060, 1065-66 (¶18) (Miss. Ct. App. 2013); *Patterson v. Patterson*, 915 So. 2d 496, 499 (¶8) (Miss. Ct. App. 2005).

¶9.     The rule that periodic alimony terminates automatically upon the recipient's remarriage is illustrated in *Patterson*, a case that bears some striking similarities to this case. In *Patterson*, Rheno Patterson stopped paying alimony after his ex-wife, Melba, remarried in 1974. *Patterson*, 915 So. 2d at 498 (¶2). Rheno and Melba "did not communicate again until 2003" when Melba filed a contempt action against Rheno for nonpayment of alimony. *Id.* The chancellor found that Rheno was in contempt and ordered him to pay $13,650 in

---

[4] The chancellor correctly determined that there are no genuine issues of material fact. We review the chancellor's grant of summary judgment and conclusions of law de novo. *Bd. of Educ. of Calhoun Cnty. v. Warner*, 853 So. 2d 1159, 1162 (¶¶12-13) (Miss. 2003).

unpaid alimony. *Id.* at (¶3). However, this Court reversed, holding that "periodic alimony terminates automatically upon . . . the remarriage of the receiving spouse." *Id.* at 499 (¶8). We explained that "alimony terminated when [Melba remarried] in July of 1974," and "[i]t was therefore error to find [Rheno] in contempt for not paying alimony, which he was no longer obligated to pay." *Id.* at 499-500 (¶¶8-9).

¶10. In addition, the Mississippi Supreme Court has held that an alimony recipient's voluntary remarriage automatically terminates alimony even if the remarriage is later found to be voidable or void and annulled. *Boren*, 425 So. 2d at 1354-56; *Bridges*, 217 So. 2d at 283-84. In *Bridges*, the recipient's remarriage was deemed voidable and annulled because her new husband (Ferrell) had induced her to marry based on fraudulent representations about his financial status. *Bridges*, 217 So. 2d at 281-82. Nonetheless, the Court reasoned that when the alimony recipient "undertook to [remarry] she made an election to look to Ferrell as the man from whom she would receive her support, and relinquished her right to receive further alimony from Bridges." *Id.* at 284. Therefore, she "was not entitled to any further alimony from Bridges after the date of the ceremonial marriage to Ferrell." *Id.* In *Boren*, the Court held that the same rule applied when the alimony recipient's remarriage was later annulled as bigamous and void. *Id.* at 1355. The Court held that the ceremonial marriage, though later deemed void, automatically terminated the recipient's right to receive alimony. *Id.* at 1355-56.

¶11. Thus, the law is clear regarding the effect of an alimony recipient's entry into a formal or "de jure" marriage. There is no dispute that if Martha had entered into a formal or de jure

5

marriage with Froyum, Justin's obligation to pay alimony would have automatically terminated as of the date of the marriage. Justin argues that Martha's admitted de facto marriage to Froyum should have the same legal effect as a de jure marriage. In contrast, Martha argues that because Justin never filed a motion to terminate alimony, her right to alimony payments vested as each came due and cannot be retroactively terminated.[5] This precise issue appears to be an issue of first impression in Mississippi.

¶12. The law regarding termination of alimony based on a de facto marriage has been summarized as follows:

> [A]limony can be terminated based on proof of what has been termed a "de facto marriage." A de facto marriage may be proven in two ways. First, a chancellor may find a de facto marriage if the alimony recipient is deliberately avoiding remarriage merely to continue receiving alimony. *See Martin v. Martin*, 751 So. 2d 1132, 1136 (¶16) (Miss. Ct. App. 1999). Second, a de facto marriage can be found . . . if the alimony recipient and another person have "so fashioned their relationship, to include their physical living arrangements and financial affairs, that they could reasonably be considered as having entered into a de facto marriage." *Pope v. Pope*, 803 So. 2d 499, 504 (¶12) (Miss. Ct. App. 2002).

*Hughes v. Hughes*, 186 So. 3d 394, 400 (¶18) (Miss. Ct. App. 2016) (citation omitted). This Court and the Supreme Court have reasoned that when "an alimony recipient spouse purposefully avoids marriage merely to continue receiving alimony, equity should not require the paying spouse to endure supporting such misconduct." *Martin*, 751 So. 2d at 1136 (¶16) (quoting *Anderson v. Anderson*, 692 So. 2d 65, 72 (Miss. 1997)). This Court has also held:

> The law is, in effect, that if the alimony recipient and another individual have

---

[5] *See, e.g.*, *Gregg v. Montgomery*, 587 So. 2d 928, 933 (Miss. 1991) ("Periodic alimony becomes fixed and vested on the date in which the payment is due and unpaid. . . . [A] court cannot give relief from civil liability for any payments that have already accrued.").

6

so fashioned their relationship, to include their physical living arrangements and their financial affairs, that they could reasonably be considered as having entered into a de facto marriage, *then the obligor may be relieved of his obligation to pay alimony the same as if his former spouse had entered into a de jure marriage*.

*Pope*, 803 So. 2d at 504 (¶12) (emphasis added); *accord Coggins v. Coggins*, 132 So. 3d 636, 644 (¶32) (Miss. Ct. App. 2014); *Burrus v. Burrus*, 962 So. 2d 618, 624 (¶23) (Miss. Ct. App. 2006).

¶13.    Given our holding that an alimony recipient's entry into a de facto marriage terminates the payor's "obligation to pay alimony *the same as if his former spouse had entered into a de jure marriage*," *Pope*, 803 So. 2d at 504 (¶12) (emphasis added), the legal effect of Martha's de facto marriage to Froyum should be the same as if she had entered into a de jure marriage. As discussed above, there is no question that an alimony recipient's entry into a de jure marriage terminates alimony immediately and automatically. *See supra* ¶¶ 8-10. Therefore, we conclude that Justin's alimony obligation automatically terminated in 1992 when Martha admittedly entered into a de facto marriage with Froyum. It necessarily follows that Martha has no right to recover any alimony after that date and that the chancellor properly granted Justin's motion for summary judgment.

¶14.    Moreover, as this Court stated in *Martin*, "equity should not require" a party to continue paying periodic alimony to a former spouse who has entered into a de facto marriage with a new partner. *Martin*, 751 So. 2d at 1136 (¶16) (quoting *Anderson*, 692 So. 2d at 72). Here, Martha is seeking to force Justin to pay her over *$265,000* in alimony, all of which allegedly accrued after she had been in a de facto marriage with another man for

7

more than two decades.[6]  As stated in *Martin*, equity does not require such a result.

## CONCLUSION

¶15.    Martha's admitted de facto marriage to Froyum automatically terminated Justin's periodic alimony obligation.[7]  Therefore, the chancellor properly granted Justin's motion for summary judgment.

¶16.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND EMFINGER, JJ., CONCUR.  McCARTY, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.  SMITH, J., NOT PARTICIPATING.**

---

[6] As noted above, Martha concedes a seven-year statute of limitations applies to her claim and that she cannot recover payments due more than seven years before she filed her complaint.  *See supra* ¶5 & n.3.  However, she argues that Justin's obligation to pay alimony remained in effect until she admitted the existence of a de facto marriage in March 2022.

[7] We note that our holding only applies to a de facto marriage.  Our holding does not apply to an alimony recipient's mere cohabitation, which, depending on the facts of the case, may or may not constitute a material change in circumstances warranting a modification or termination of alimony.  *See generally Heiter v. Heiter ex rel. Sheffield*, 192 So. 3d 992, 995-96 (¶¶9-11) (Miss. 2016); *see also Dupre v. Dupre*, 71 So. 3d 1226, 1229 (¶21) (Miss. Ct. App. 2011) (affirming termination of alimony based on recipient's cohabitation retroactive to the date the petition to terminate alimony was filed).