# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00600-COA

**CHRISTINA LYNN SULLIVAN LEBLANC**          **APPELLANT**

**v.**

**WILLIAM CLARENCE LEBLANC, III**          **APPELLEE**

DATE OF JUDGMENT: 03/15/2017
TRIAL JUDGE: HON. DEBORAH J. GAMBRELL
COURT FROM WHICH APPEALED: FORREST COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT: CAROL ANN ESTES BUSTIN
ATTORNEY FOR APPELLEE: NANCY STEEN
NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS
DISPOSITION: AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 10/23/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., WILSON AND WESTBROOKS, JJ.**

**WILSON, J., FOR THE COURT:**

¶1. After twenty-three years of marriage, Christina Leblanc filed for a divorce from William (Billy) Leblanc on the grounds of habitual cruel and inhuman treatment, habitual use of illegal drugs, and uncondoned adultery or, in the alternative, irreconcilable differences. Billy eventually answered and filed a counterclaim for an irreconcilable differences divorce. After the first day of trial, the Leblancs consented to an irreconcilable differences divorce and agreed that the chancery court would decide issues related to custody and support of their children, equitable division of the marital estate, and alimony. The court granted Christina physical custody of the parties' three minor children, with joint legal custody and visitation for Billy. The court also divided the marital estate and ordered Billy to pay rehabilitative

alimony of $250 per month for eighteen months and child support of $1,040 per month.

¶2. On appeal, Christina argues that the chancery court (1) miscalculated Billy's child support obligation, (2) committed multiple errors in the equitable division of the marital estate, (3) awarded inadequate alimony, (4) erred by awarding Billy unsupervised visitation despite his history of drug use, (5) erred by not holding Billy in contempt for failing to pay the mortgage on the marital home, and (6) erred by allowing Billy to answer the complaint for divorce more than a year after he was served. Billy failed to file a brief on appeal.

¶3. We find no error or abuse of discretion in the chancery court's equitable division of the marital estate. However, we hold that the chancery court miscalculated Billy's child support obligation and awarded inadequate alimony. Accordingly, on those two issues, we reverse and remand the case for further proceedings consistent with this opinion. In addition, on remand the chancery court should determine whether unsupervised visitation is consistent with the children's best interests and whether Billy should be ordered to submit to additional drug testing. The remaining issues raised by Christina on appeal are procedurally barred and/or without merit.

## FACTS AND PROCEDURAL HISTORY

¶4. Christina and Billy married in 1991. They subsequently had four children, sons born in 1996 and 2002 and daughters born in 2010 and 2011.

¶5. Billy has worked as a medical dosimetrist since approximately 2000. Billy testified that a medical dosimetrist creates "treatment plans for radiation therapy treatments for cancer

2

patients." From about 2006 to 2013, Billy worked at the Laurel Cancer Center, but in 2013 he lost his job there because he failed a drug test.

¶6. Billy's former supervisor, Dr. Cameron Pimperl, a radiation oncologist at the Laurel Cancer Center, testified at trial. Dr. Pimperl was close to the Leblanc family. In 2012 or 2013, Dr. Pimperl became aware that Billy was using drugs. A lawyer advised him to terminate Billy's employment, but Dr. Pimperl offered Billy the option of entering a drug rehabilitation program. Billy entered the program, but in October 2013 he failed another drug test. At that point, the Laurel Cancer Clinic terminated Billy's employment.

¶7. Billy was then unemployed for over a year before he found work in Alaska. He lived in Alaska between 2014 and 2016. At the time of trial, Billy was working as a medical dosimetrist at Keesler Medical Center in Biloxi.

¶8. Christina filed for divorce in July 2014 on the grounds of habitual cruel and inhuman treatment, habitual use of illegal drugs, and uncondoned adultery or, in the alternative, irreconcilable differences. Billy was living in Alaska at the time and was eventually served with a summons and copy of the complaint on August 27, 2015.

¶9. On August 25, 2015, Christina obtained an ex parte emergency domestic abuse protection order from the Forrest County Justice Court. On July 6, 2016, the justice court entered a second protection order. Christina testified that she allowed the first protection order to expire without further action because Billy had returned to Alaska in the interim. The justice court extended the second order once.

3

¶10. Billy filed an answer on July 18, 2016. He denied Christina's allegation of cruel and inhuman treatment, and he claimed that he had "reformed and discontinued [his drug] habit" and was willing to submit to court-ordered drug tests. "On the allegation of adultery, [Billy] demand[ed] strict proof and assert[ed] the defense of condonation." Billy also filed a counterclaim for an irreconcilable differences divorce.

¶11. On August 2, 2016, Christina filed a motion for temporary relief seeking custody of the parties' children, child support, spousal support, use and possession of the marital home, and an order of protection from abuse. Christina also asked the court to limit Billy to supervised visitation, require Billy to take random drug tests, and require Billy to account for certain marital funds. Finally, Christina asked the court to order Billy to pay the mortgage arrearage on the marital home, as the home was at risk of foreclosure.

¶12. In August 2016, Christina and Billy filed their Uniform Chancery Court Rule 8.05 financial statements. Christina's statement showed that she earned $1,380 per month and received $771 per month in public assistance. Billy's statement showed that he earned $11,330.50 per month as a dosimetrist and received rental income of $91 per month.

¶13. On August 19, 2016, the chancery court entered a temporary order granting physical custody of the children to Christina with Billy to have supervised visitation. The court also granted Christina possession of the marital home and ordered Billy to bring the mortgage current and to continue to pay the mortgage. The court ordered Billy to pay Christina $600 per month in spousal support and $1,000 per month in child support. The court also ordered

4

both parties to submit to drug testing.

¶14. On October 22, 2016, Christina filed a motion for contempt based on Billy's failure to pay the mortgage arrearage. Christina also requested modification of the temporary order because Billy had tested positive for methamphetamine and admitted that he was still using drugs. In response, Billy claimed that he "struggled just to make the monthly mortgage payments" and could not afford to pay the arrearage. He also denied that he was abusing drugs, alleged that Christina had denied him visitation, and requested additional visitation.

¶15. On December 1, 2016, the chancery court entered an order continuing Billy's supervised visitation with conditions. The court also ordered Billy to continue to pay the mortgage, and the court again ordered Billy to pay the arrearage immediately. Finally, the court ordered Billy to provide the court with his most recent drug test results, as the court had ordered him to be tested again by November 14, 2016.

¶16. Christina filed a second motion for contempt and modification on January 6, 2017. Billy still had not paid the mortgage arrearage, and Christina alleged that he was in arrears on child support and spousal support as well. Christina alleged that Billy was earning more than $8,800 a month as a dosimetrist at Keelser and could afford to pay the arrearage. Christina also alleged that Billy had tested positive for methamphetamine twice and had admitted to her that he was still using drugs. The hearing on Christina's motion was set for January 12, 2017, the first day of the trial on Christina's complaint for divorce.

¶17. In response, Billy again claimed that he was unable to pay the mortgage arrearage, and

he denied that he earned $8,800 per month. Billy's most recent 8.05 statement, which he submitted in December 2016, showed that his gross monthly income was $8,500, but Billy claimed that his true monthly income was only $7,562. The day before trial, Billy filed an updated 8.05 statement showing that he was working as dosimetrist at Keesler, that he earned $7,562 per month, and that his net monthly income was $5,201.

¶18.   Christina has an associate's degree from a community college and works as a dental hygienist. On the first day of trial, Christina testified that she worked for a dental clinic in Hattiesburg and that her net income was approximately $2,100 per month.

¶19.   At trial, Christina testified that she first suspected that Billy was using drugs in 2010. She testified that Billy began lying about his whereabouts—e.g., falsely claiming that he was at work or at St. Jude's with their daughter.[1] Christina testified that Billy also began having mood swings and sleeping for days at a time. Christina testified that Billy admitted that he was using drugs when they learned that she was pregnant in 2011, but he assured her that he would stop. Despite Billy's assurances, Christina later found drug paraphernalia hidden in their home, and in 2013 Billy lost his job as a result of failed drug tests.

¶20.   Billy was unemployed for more than a year thereafter. During this period, he began withdrawing savings from the couple's Northwestern Mutual IRA. Evidence presented at

---

[1] The Leblancs' third child was diagnosed with Retinoblastoma, a form of eye cancer, when she was only two months old. She lost her vision in one eye, and Christina testified that her prognosis is still considered "terminal." However, Billy testified that "[s]he's pretty much cured," and "there's no evidence of the cancer anywhere in her."

trial indicated that the IRA had a balance of about $60,000 in 2014, but by July 2016 only $0.54 remained. Christina believed that some of the money that Billy withdrew went to maintain their household, but she was unsure "where all of the money went." She testified that she was unable to work at times while Billy was in Alaska because she "had too many obligations to take care of [their] children." She testified that she began relying on credit cards and a bank loan to make ends meet.

¶21. Christina also testified that in 2013 or 2014 she discovered that Billy was having an affair. Christina testified that she found inappropriate pictures and conversations with other women on Billy's phone, and she found sex toys in their camper. Christina also testified that she received several "hang-up [phone] calls" that she traced back to women she did not know. According to Christina, Billy admitted that he was having an affair. He told Christina that she had "neglected his sexual needs so he . . . found comfort with other women."

¶22. As noted above, Billy worked in Alaska between 2014 and 2016. He testified that he sent some money home while he was in Alaska, and Christina admitted that she received money from Billy during that time.

¶23. Billy returned from Alaska around April 2016, and Christina suspected that he was still using drugs. Christina testified that Billy received packages that he had mailed to himself from Alaska, and soon after the packages arrived, he would "pick fights" and take their camper and leave for days at a time. She testified that she sought a protective order after one of her sons warned her not to come home because Billy was "throwing heavy things

7

. . . in fits of rage." Christina testified that in April or May 2016, she allowed one of their daughters to spend the night with Billy in the camper because her daughter "wanted to snuggle with her daddy." Christina testified that when she went to wake up her daughter the next morning, she found a used drug syringe that Billy had left in the bed.

¶24. Christina introduced photographs at trial that she testified showed bruises to her neck and jaw. Christina testified that Billy inflicted the injuries on her in May 2016. She testified that Billy became angry after she tried to convince him to leave the marital home because he had been using methamphetamine. Christina testified that she eventually threatened Billy with a baseball bat, but Billy "ripped [the] bat out of [her] hands" and then abused her. After the incident, Christina obtained a second protective order from the justice court.

¶25. Billy testified to a substantially different version of the incident. He claimed that he had a toothache and was trying to rest when Christina began screaming at him for no reason. He testified that Christina told him "to get out of the house" because he was a drug addict. He claimed that Christina would not allow him to pack and began hitting his truck with the baseball bat. He testified that Christina ultimately left the house with the children.

¶26. Christina testified that Billy subsequently sent her numerous "very ugly" text messages. She also claimed that Billy pushed her and intimidated her physically. She testified that his behavior frightened her and caused her to have panic attacks.

¶27. Billy tested positive for amphetamine and methamphetamine on August 15, 2016 and November 14, 2016. Billy's second test showed a significant increase in levels from the first

8

test, suggesting that his drug use had increased. Christina testified that as recently as December 2016 Billy admitted to her that he was still using drugs. At trial, Billy admitted that he has had problems with drugs and that he had used drugs in the marital home.

¶28. Approximately six weeks passed between the first day of trial (January 12, 2017) and the second day of trial (February 22, 2017). At the beginning of the second day, the Leblancs consented to an irreconcilable differences divorce and agreed to submit the issues of custody, child support, equitable division, and alimony to the chancery court for determination.

¶29. Christina then testified that she learned that she had lost her job at the end of the first day of trial. She testified that she was doing some contract work, which paid between $215 and $280 per day. However, she had been unable to find full-time employment. She testified that it was difficult to find full-time employment because there is an oversupply of dental hygienists. She was also using a public assistance program to avoid foreclosure and to take classes in healthcare administration at William Carey University.

¶30. Sally Thomas, who prepared the Leblancs' taxes, testified that in 2012 Billy earned $125,698, while Christina earned $3,294. In 2013, Billy earned $89,540, while Christina earned $22,877. At trial, Billy testified that when he was working full-time he typically earned between $105,000 and $120,000 per year.

¶31. The Leblancs agreed that the fair market value of the marital home was $223,000. Christina testified that their mortgage was modified in November 2016 to avoid foreclosure. As of December 2016, the mortgage balance was $176,857.73, which included an arrearage

of $8,342.83 because there had been no payment on the mortgage since July 2016. The mortgage was later modified again to lower the payment to $1,232 per month.

¶32.  Billy testified at trial that he was living in a camper that the family bought around 2005 or 2006. He was paying $27 a night to park the camper at a campground across the street from the Boomtown Casino in Biloxi.

¶33.  The parties' 8.05 statements listed the camper, a 2009 Chevy Suburban, a 1994 Mazda 8300, and a 2004 Chevy Silverado. The parties also listed several marital debts.

¶34.  On March 15, 2017, the chancery court entered findings of fact, conclusions of law, and a final judgment granting the parties an irreconcilable differences divorce. The court granted Christina physical custody of the parties' three minor children with joint legal custody and unsupervised visitation for Billy. The court found that the parties' oldest child was emancipated. The court ordered Billy to pay child support of $1,040 per month.

¶35.  The chancery court found that neither party had any separate property and valued the marital property. The court awarded Christina the marital home and ordered her to pay the mortgage. The court also divided the remaining marital assets and assigned each party responsibility for some of the marital debts. Finally, the court ordered Billy to pay Christina $250 a month in rehabilitative alimony for eighteen months. Christina subsequently filed a timely notice of appeal.

**ANALYSIS**

¶36.  "When reviewing a decision of a chancellor, this Court applies a limited abuse of

10

discretion standard of review." *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003). We will affirm the decision unless the chancellor clearly or manifestly erred or applied the wrong legal standard. *Id.* "However, on issues of law, our standard of review is de novo." *Stroh v. Stroh*, 221 So. 3d 399, 406 (¶17) (Miss. Ct. App. 2017).

¶37. Billy's attorney entered an appearance on appeal but failed to file a brief or respond to a show-cause notice. The appellee's failure to file a brief does not require "[a]utomatic reversal." *Rogillio v. Rogillio*, 101 So. 3d 150, 153 (¶12) (Miss. 2012). In particular, we will review the record despite the appellee's failure when the interests of children are at stake. *Garceau v. Roberts*, 363 So. 2d 249, 250 (Miss. 1978). However, the "failure of an appellee to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of [the appellant], that there was no error." *Rogillio*, 101 So. 3d at 153 (¶12) (quoting *Dethlefs v. Beau Maison Dev. Corp.*, 458 So. 2d 714, 717 (Miss. 1984)).

¶38. As discussed above, Christina argues that the chancery court miscalculated Billy's child support obligation, committed multiple errors in the equitable division of the marital estate, and awarded inadequate alimony. Christina also argues that the chancery court erred by awarding Billy unsupervised visitation, by failing to find Billy in contempt, and by allowing Billy to file an untimely answer. We address these issues in turn.

### I. Child Support

¶39. The chancery court found that Billy "should pay the statutory guideline child support"

and ordered him to pay $1,040 per month. In remarks from the bench, the court stated that $1,040 was twenty percent of $5,201, which was the net monthly pay shown on Billy's most recent 8.05 statement.

¶40. On appeal, Christina argues that Billy should have been required to pay twenty-two percent of his adjusted gross income for the parties' three minor children. *See* Miss. Code Ann. § 43-19-101(1) (Rev. 2015) (establishing a rebuttable presumption that support for three children should be twenty-two percent of the payor's adjusted gross income). Christina also argues that Billy's Rule 8.05 statement understated his true income.

¶41. As to the first point, Christina is correct that the statute calls for Billy to pay twenty-two percent of his adjusted gross income, not twenty percent. *Id.* The chancery court stated that it intended to follow the statute. The court simply applied the wrong percentage.

¶42. In addition, we agree with Christina that Billy's Rule 8.05 statement understated his true income. Billy's pay statements for the final months of 2016 show gross earnings of approximately $10,000 per month and net pay—after deductions for taxes, 401k contributions, and health, dental, and life insurance—of approximately $7,000 per month. At trial, Billy agreed that those records accurately reflected his adjusted gross income:

> THE COURT:     So the Court then can use these monthly payroll figures
>                as your adjusted gross income?
>
> THE WITNESS:   (Nods Head Affirmatively.)
>
> THE COURT:     $7,138.39?
>
> THE WITNESS:   Yes, ma'am; yeah.

12

¶43. Thus, under the statutory guidelines, there is a presumption that Billy should pay child support equal to twenty-two percent of his adjusted gross income of approximately $7,138.39. Therefore, we reverse and remand for the court to recalculate child support based on the applicable statutory percentage and Billy's true adjusted gross income. *See Sellers v. Sellers*, 22 So. 3d 299, 308 (¶31) (Miss. Ct. App. 2009) ("[A]n erroneous calculation of . . . adjusted gross income" requires reversal "[s]ince the appropriate amount of child support is based on a party's properly calculated adjusted gross income[.]").

## II.    Equitable Division

¶44.    "[A]n equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006). In *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), the Supreme Court identified a non-exclusive list of factors for the chancery court to consider when attempting to divide marital property.

¶45.    Christina does not challenge the chancery court's identification of the marital assets and debts. In addition, the chancery court expressly addressed each of the *Ferguson* factors. However, Christina argues that the chancery court (1) based its decision on "inadequate financial information," (2) failed to address Billy's dissipation of the parties' Northwestern

13

Mutual IRA, and (3) unfairly assigned certain marital debts to her.

¶46.    Christina claims that the chancery court relied on "inadequate financial information" because "[n]either party submitted adequate final information."  Christina argues that the "[c]ourt should have reserved ruling" and waited for the parties to present better evidence. This argument is without merit.  The case was pending for thirty months prior to trial, and both parties declared ready for trial.  The burden is on *the parties* to present evidence, not the court.  If there were better evidence available, it was Christina's burden to present it.  "The chancellor is not expected to go beyond the evidence that the parties present in order to value the marital assets."  *Inge v. Inge*, 227 So. 3d 1185, 1191 (¶19) (Miss. Ct. App. 2017).[2]

¶47.    Christina next argues that the chancery court failed to account for Billy's dissipation of the Northwestern Mutual IRA, a marital asset.  *See Ferguson*, 639 So. 2d at 928 (stating that the court should consider "[t]he degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets").  As noted above, there was evidence that the IRA had a balance of about $60,000 in 2014, but by the end of the marriage only $0.54 remained. However, Billy testified that he had to make withdrawals to pay the mortgage on the marital home and meet other expenses while he was out of work.  In addition, Christina admitted that some of the money went to maintain the household, and she did not "know where all of the

---

[2] Within this argument, Christina also complains that the chancery court declined to consider an "updated" Rule 8.05 statement that she first disclosed and attempted to introduce on the second day of trial.  It appears that the chancery court simply declined to consider revisions to estimates of asset values that Christina failed to disclose to Billy prior to the second day of trial.  We find no abuse of discretion in the court's ruling.

14

money went." There was no evidence that Billy spent the funds for improper purposes.

¶48. The use of marital funds to pay legitimate and reasonable living expenses of both spouses during a separation does not necessarily amount to dissipation. *See Pittman v. Pittman*, 791 So. 2d 857, 865 (¶22) (Miss. Ct. App. 2001), *overruled on other grounds by Collins v. Collins*, 112 So. 3d 428, 432 (¶11) (Miss. 2013); Deborah H. Bell, *Mississippi Family Law* § 6.08[2][f][i], at 178 (2d ed. 2011). Nonetheless, the chancery court considered this issue in its analysis of the *Ferguson* factors. The court criticized Billy for "incurring penalties and taxes." And the court ultimately counted $33,000 in withdrawals as a marital asset distributed to Billy in the equitable division of the marital estate. Thus, the chancery court did consider the issue. The court was not required to order Billy to pay a specific sum to Christina as repayment for the withdrawals. *See Pittman*, 791 So. 2d at 865 (¶22). We find no abuse of discretion in the court's treatment of this issue.

¶49. Finally, Christina argues that the chancery court erred by assigning her approximately $14,000 in marital debt, while assigning Billy only about $7,000 in marital debt. She argues that Billy earns more and, therefore, should be required to pay more of the debt. However, the court also awarded Christina marital assets, including the marital home, with a net value of approximately $65,000, while awarding Billy assets with a value of about $45,000. Moreover, as discussed just above, Billy's assets included $33,000 in IRA withdrawals. In substance, that figure was a charge against Billy, not an asset with any present value. The only significant assets that Billy actually received in the divorce were an eleven-year-old

15

camper, a thirteen-year-old truck, and a four-wheeler. "[I]n cases of equitable distribution, we do not look at the division of one asset [or debt] in isolation, but rather, whether the marital assets [and debts] as a whole were divided equitably." *Dogan v. Dogan*, 98 So. 3d 1115, 1124 (¶20) (Miss. Ct. App. 2012). Here, under any calculation, Christina received assets and debts with a greater net value than Billy. We cannot find that the chancery court abused its discretion by assigning her somewhat more debt than Billy. Nor can we find any clear error or abuse of discretion in the equitable division as a whole.

### III.    Alimony

¶50.    "After the marital property is equitably divided, the chancellor must consider whether the division, in light of the parties' nonmarital assets, will adequately provide for both parties; if so, then 'no more need be done.'" *Rodrigue v. Rodrigue*, 172 So. 3d 1176, 1187 (¶41) (Miss. Ct. App. 2014) (quoting *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)). However, alimony should be considered if the equitable division of marital property, together with any separate property, "leaves a deficit for one party." *Id.* at (¶42). By "deficit," we mean that "the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015) (emphasis omitted) (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)).

¶51.    If one party is left with a deficit, the chancery court must consider the *Armstrong* factors in determining whether to award alimony and the amount and type of the award. *See*

16

*Lauro v. Lauro*, 847 So. 2d 843, 848 (¶¶11-13) (Miss. 2003). The *Armstrong* factors are:

1.  The income and expenses of the parties;

2.  The health and earning capacities of the parties;

3.  The needs of each party;

4.  The obligations and assets of each party;

5.  The length of the marriage;

6.  The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7.  The age of the parties;

8.  The standard of living of the parties, both during the marriage and at the time of the support determination;

9.  The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

¶52.   "The award of alimony and the amount of any such award is largely within the discretion of the chancellor." *Monroe v. Monroe*, 745 So. 2d 249, 252 (¶13) (Miss. 1999). "Nonetheless, this Court will reverse an award of alimony on appeal when it is determined to be against the overwhelming weight of the evidence." *Id.* "In the case of a claimed

17

inadequacy or outright denial of alimony, we will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion." *Armstrong*, 618 So. 2d at 1280. "If we find the chancellor's decision manifestly wrong, or that the court applied an erroneous legal standard, we will not hesitate to reverse." *Id.*

¶53. In this case, the chancery court's opinion discusses each of the *Armstrong* factors. The opinion then states: "the [c]ourt finds that [Billy] shall pay to Christina rehabilitative alimony in the sum of $250.00 per month for 18 months." In announcing its decision from the bench, the court stated that the payment was "for the purpose of securing health insurance either in the marketplace or wherever" and "to assist [Christina] with getting back into the job market."

¶54. On appeal, Christina argues that the chancery court's award was inadequate given the parties' respective incomes and expenses. In addressing Christina's argument, we again note that Billy's "[f]ailure . . . to file a brief is tantamount to confession of error and will be accepted as such unless [we] can say with confidence, after considering the record and [Christina's] brief . . . , that there was no error." *Rogillio*, 101 So. 3d at 153 (¶12) (quoting *Dethlefs*, 458 So. 2d at 717). Having considered the record, we agree with Christina that the limited award of rehabilitative alimony was inadequate.

¶55. With respect to the first two *Armstrong* factors, the chancery court found:

> Both parties have sufficient incomes. At present, [Billy's] income is greater. The [c]ourt has considered the testimony and evidence from both parties as to their current living circumstances, educational background, work experience, income and expenses . . . . Both parties are in good health and capable of

18

earning at capacity although Christina lost her job between the first and second day of trial and is looking for work and health insurance.

¶56. We conclude that the chancery court clearly erred by finding that Christina's income is "sufficient," as there is no substantial evidence in the record to support such a finding. Christina's August 2016 Rule 8.05 financial statement showed monthly wages of only $1,380 and public assistance of $771 per month. In December 2016, she reported income of $2,322 per month. However, as the chancery court acknowledged, Christina lost her job prior to the second day of trial, which left her dependent on irregular "contract" work that did not offer health insurance. Christina also testified that there was an oversupply of dental hygienists in the area, which made it difficult to find a full-time job.

¶57. Christina received food stamps during Billy's absence, and their children were enrolled in Medicaid. She qualified for food stamps once again after she lost her job during trial. The mortgage on the marital home had been modified but was still approximately $1,213 per month. Christina had also received public assistance to help her to avoid foreclosure. Christina's Rule 8.05 statement also lists various other ordinary expenses for a family, such as food, utilities, childcare, out-of-pocket medical expenses, auto insurance and repairs, gasoline, and telephone bills. As discussed above, the divorce decree also required Christina to pay approximately $14,000 in marital debt (in addition to the mortgage). The evidence at trial showed that Christina's income was not sufficient to meet her ordinary living expenses. Indeed, the evidence showed that she needed public assistance to make ends meet.

¶58. In contrast, as discussed above, the evidence showed that Billy's gross pay at Keesler was approximately $10,000 per month and his net pay—after deductions for taxes, health insurance, and 401(k) contributions—was over $7,000 per month. Billy's present earnings are consistent with his own testimony at trial that he makes $120,000 annually when he is working. Aside from basic living expenses, Billy's only significant expenses were his camper note (approximately $180 per month), rent ($27 per night), and child support. Thus, the evidence at trial showed that Billy's income was more than sufficient to meet his reasonable needs and living expenses.

¶59. As to the other relevant *Armstrong* factors, it is significant that the parties were married for twenty-five years. This "undoubtedly qualified as a long marriage." *Tilley v. Tilley*, 610 So. 2d 348, 352 (Miss. 1992) (twenty-two year marriage); *see also* Bell, *Mississippi Family Law* § 9.04[5][a], at 265 ("Marriage length may be the most critical factor in determining whether a [financial] disparity [between the parties] should be remedied by alimony. . . . [A]n analysis of Mississippi alimony awards reveals a distinct pattern of increasing size and length of awards in longer marriages.").

¶60. The chancery court also noted that, although the parties had consented to an irreconcilable differences divorce, "[t]he [c]ourt heard testimony about [Billy's] drug issues." Indeed, Billy admitted that he had struggled with drugs, he lost a good-paying job—and ultimately departed for Alaska—because of his drug use, and Billy continued to test positive for methamphetamine during this proceeding. Christina also testified that Billy admitted to

adultery. Billy never directly denied that he had committed adultery. In his answer, he only demanded "strict proof" and pled condonation. *See Armstrong*, 618 So. 2d at 1280 (stating that a party's "[f]ault or misconduct" is relevant to the determination of alimony).

¶61. The chancery court also found some "dissipation" of assets by Billy because his early withdrawals from the Northwestern Mutual IRA resulted in taxes and penalties. However, the court also noted that at least some of the withdrawals were used to support the family.

¶62. In addition, the chancery court granted Christina physical custody of the parties' three minor children. Billy was ordered to pay child support; however, Christina testified that she had to pay for daycare for her younger children so that she could work. *See Armstrong*, 618 So. 2d at 1280 (stating that the court should consider whether one party will need to provide or pay for childcare).

¶63. On comparable facts in *Rodrigue*, we found the chancery court's award to be grossly inadequate and an abuse of discretion. *Rodrigue*, 172 So. 3d at 1187-89 (¶¶41-46). There, the parties had been married for twenty-three years, and the wife was granted physical custody of their two teenage children. *Id.* at 1188 (¶43). The wife's net monthly income, including child support, was $2,457.53, while the husband's net monthly income was $5,546.30. *Id.* at 1187 (¶43). In equitably dividing the marital estate, the chancery court awarded the wife approximately $50,000 in home equity and approximately $70,000 in retirement funds. *Id.* at 1180, 1182, 1185-87 (¶¶15, 17, 33-39). In addition, the chancery court awarded lump-sum alimony of $13,562.41 in the form of an order requiring the

husband to continue to pay the wife's car note. *Id.* at 1187 (¶42). On appeal, we held that the chancery court's lump-sum award was "unjust and grossly inadequate." *Id.* at 1189 (¶46). We further held that the facts of the case "clearly indicate[d]" that the wife was "entitled to an award of periodic alimony and/or lump-sum alimony." *Id.* at 1189 (¶45).

¶64. We reach the same conclusion in this case. If anything, the disparity in earning capacity is greater here than it was in *Rodrigue*. *See Davis v. Davis*, 832 So. 2d 492, 499 (¶23) (Miss. 2002) ("A significant disparity in earning capacity is a major factor in the determination of a periodic alimony award."); *Vaughn v. Vaughn*, 798 So. 2d 431, 436 (¶19) (Miss. 2001) (same). Moreover, the wife in *Rodrigue* received marital assets with a greater net value than Christina did in this case. In addition, in *Rodrigue*, the chancery court had awarded lump-sum alimony of $13,562.41. Here, in contrast, the chancery court awarded Christina total rehabilitative alimony of only $4,500. Given that the award in *Rodrigue* was inadequate, it necessarily follows that the award in this case is also inadequate.

¶65. Under *Armstrong*, such a limited award of rehabilitative alimony is "unjust" and "grossly inadequate." *Armstrong*, 618 So. 2d at 1280. Christina has struggled to find work, and even when she has been employed, her income has been insufficient to support herself and pay the mortgage on the marital home. In Billy's absence, Christina and her children qualified for various forms of public assistance, including food stamps, Medicaid, and mortgage assistance. Billy, in contrast, has a gross income of approximately $120,000 per year with no significant expenses. As in *Rodrigue*, we reverse and "remand the case for

22

further consideration of an appropriate lump-sum or periodic alimony award." *Rodrigue*, 172 So. 3d at 1189 (¶46); *see Stroh*, 221 So. 3d at 414 (¶49) (explaining that lump-sum alimony can "serve a function similar to periodic alimony" and may be awarded "in lieu of periodic alimony, in appropriate cases").

### IV. Visitation

¶66. "The chancellor has broad discretion when determining appropriate visitation and the limitations thereon." *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994). "When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child." *Id.* "[T]here must be evidence presented that a particular restriction on visitation is necessary to avoid harm to the child before a chancellor may properly impose the restriction." *Id.* "Otherwise, the chancellor's imposition of a restriction on a non-custodial parent's visitation is manifest error and an abuse of discretion." *Id.* However, a chancellor may require visitation to be supervised based evidence of continued drug abuse by the non-custodial parent. *See* Bell, *Mississippi Family Law* § 12.08[4], at 378-79. A court may also order parents to continue to submit to drug testing. *See McLemore v. McLemore*, 762 So. 2d 316, 322 (¶19) (Miss. 2000).

¶ 67. Prior to trial in this case, the chancery court entered two orders requiring supervision of Billy's visitation. The orders were based on concerns about Billy's continued drug use.

During the same time period, Billy failed both of his court-ordered drug tests, testing positive for methamphetamine and amphetamines in August 2016 and again in November 2016. A few months later at trial, the court heard additional testimony and evidence regarding Billy's drug use and history of drug addiction. Billy admitted at trial that he had used drugs at home and "had some issues with drugs." Billy did not testify that those issues had been addressed, nor is there any evidence that they were. There is no evidence in the record that Billy ever passed a drug test during the course of this case, and the results of his November 2016 drug test suggested that his drug use had actually increased. Despite these issues, the court's final judgment awarded Billy substantial unsupervised visitation, including alternating weekends, holidays, and four weeks in the summer. The court's opinion discussed Billy's drug use and failed drug tests, but the court did not explain why supervision of his visitation was no longer necessary. Nor did the court require Billy to take any additional drug tests. Christina argues that the chancery court abused its discretion by permitting unsupervised visitation.

¶68.    As stated above, in setting the terms of visitation, the chancery court "must keep the best interest of the child as [the court's] paramount concern." *Harrington*, 648 So. 2d at 545. Here, the chancery court initially restricted Billy's visitation because of concerns about his drug use, and Billy continued to test positive for methamphetamine—and *never* passed a single drug test. Nonetheless, in its final judgment, the chancery court awarded Billy unsupervised visitation. Moreover, the court did so without providing any explanation as to why supervision was no longer necessary. For the reasons discussed above, it is necessary

24

for us to reverse and remand the case on other grounds. We further hold that on remand the chancery court must determine whether unsupervised visitation is consistent with the children's best interests and whether supervision is necessary to avoid harm to the children. It has been more than a year and a half since the final judgment was entered, so the chancery court should consider evidence regarding Billy's exercise of unsupervised visitation during that time and the "circumstances at the time of the remand hearing." *Vaughn v. Davis*, 36 So. 3d 1261, 1267 (¶18) (Miss. 2010). The court may also consider whether Billy should be required to submit to additional drug tests. *See McLemore*, 762 So. 2d at 322 (¶19).

## V. Contempt

¶69. As discussed above, the chancery court twice ordered Billy to pay the arrearage on the mortgage on the marital home, and Christina filed two contempt motions based on Billy's failure to do so. Her second motion was still pending when trial began. On the first day of trial, Billy admitted that the mortgage was not current. He claimed that he was unable to pay it. Then, at the beginning of the second day of trial, the parties consented to an irreconcilable differences divorce. The chancery court's final judgment awarded Christina the marital home, along with the mortgage. However, the court's judgment did not specifically address Billy's prior contempt or the arrearage. On appeal, Christina argues that the chancery court erred by not finding Billy in contempt and by not entering a separate judgment in her favor for the mortgage arrearage.

¶70. We conclude that the issue of Billy's contempt was waived because the parties did not

list contempt among the issues to be decided by the court. In an irreconcilable differences divorce, the issues that are to be decided by the court by the consent of the parties must be "specifically set forth." *See* Miss. Code Ann. § 93-5-2(3) (Rev. 2013). "The language of section 93-5-2(3) is clear. A chancellor may decide contested issues in a divorce based upon irreconcilable differences. However, he is limited to the resolution of those issues specifically identified and personally agreed to in writing by the parties." *Myrick v. Myrick*, 186 So. 3d 429, 433 (¶17) (Miss. Ct. App. 2016) (quoting *Wideman v. Wideman*, 909 So. 2d 140, 146 (¶22) (Miss. Ct. App. 2005)) (brackets omitted). Here, the parties agreed that the chancellor would decide issues related to child custody and support, equitable division, alimony, and insurance. Contempt was not mentioned when they consented to an irreconcilable differences divorce. Therefore, we hold that the issue was waived.

¶71. In addition, our general "rule is that a party making a motion must follow up that action by bringing it to the attention of the judge and by requesting a hearing upon it. *It is the responsibility of the movant to obtain a ruling from the court on motions filed by him, and failure to do so constitutes a waiver of same.*" *Anderson v. McRae's Inc.*, 931 So. 2d 674, 678 (¶10) (Miss. Ct. App. 2006) (emphasis added; quotation marks omitted). Here, Christina noticed her motion for a hearing on the first day of trial and mentioned the motion at the outset of trial; however, she did not request a ruling on the motion when she subsequently consented to an irreconcilable differences divorce, or at any time thereafter. Therefore, there is no "ruling from the [chancery] court" for this Court to review. *Id.* Accordingly, we

26

conclude that Christina waived the issue by failing to obtain a ruling.

### VI. Untimely Answer

¶72. As noted above, Billy was served with Christina's complaint for divorce in August 2015, but he did not file his answer and counterclaim until July 2016. On appeal, Christina argues that the chancery court "should have stricken" Billy's answer and counterclaim as untimely. This issue is without merit. To begin with, Christina never raised this issue or moved to strike Billy's answer or counterclaim in the chancery court. "It is well settled that issues presented for the first time on appeal are procedurally barred from consideration." *Wood v. Miller*, 179 So. 3d 48, 50 (¶11) (Miss. Ct. App. 2015). Therefore, the issue is waived. Moreover, there are no default judgments in divorce cases, *see* Miss. Code Ann. § 93-5-7 (Rev. 2013), and Christina identifies no way in which she was prejudiced by Billy's untimely answer and counterclaim.

### CONCLUSION

¶73. We affirm the chancery court's equitable division of the marital estate. However, we reverse and remand for further proceedings consistent with this opinion on the issues of child support and alimony. On remand, the chancery court must also determine whether unsupervised visitation is consistent with the best interests of the Leblancs' children and whether Billy should be required to submit to additional drug testing.

¶74. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. IRVING, P.J., NOT**

**PARTICIPATING.**