# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00615-COA

**BILLY J. CHAPMAN**                                                         **APPELLANT**

**v.**

**JULIE H. CHAPMAN**                                                         **APPELLEE**

DATE OF JUDGMENT:           05/22/2023
TRIAL JUDGE:                HON. WAYNE SMITH
COURT FROM WHICH APPEALED:  AMITE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     WILLIAM E. GOODWIN
ATTORNEY FOR APPELLEE:      TYLER BO SHANDY
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                REVERSED AND REMANDED - 10/15/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., SMITH AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     On March 31, 2023, the Amite County Chancery Court entered a final judgment granting Julie E. Chapman and Billy J. Chapman a divorce on the ground of irreconcilable differences and deciding the issues Julie and Billy submitted to the chancellor for resolution. Billy appeals from the final judgment and from the order entered by the trial court on May 22, 2023, on his motion for reconsideration.

## FACTS AND PROCEDURAL HISTORY

¶2.     Billy and Julie Chapman were married on June 25, 2005, and had two children, born in April 2009 and July 2016. Billy and Julie separated around August 22, 2021. Julie filed a complaint for divorce on August 5, 2022, and Billy filed his answer and counterclaim on October 7, 2022. On December 16, 2022, the parties filed a "Consent of Parties to Divorce

Being Granted on the Basis of Irreconcilable Differences and Stipulation of Issues to be Decided by the Court." The case proceeded to trial that same date for the chancellor to decide those issues submitted to the court for its resolution.[1] Billy and Julie were the only witnesses. On March 31, 2023, the trial court entered its final judgment granting the divorce and deciding the remaining issues.

¶3. Aggrieved by that final judgment, Billy filed his "Motion to Reconsider, Alter, or Amend the Final Judgment" on April 6, 2023. The parties appeared before the court on May 5, 2023, for a hearing on Billy's motion. The chancellor heard the arguments of counsel in support of and in opposition to the motion and announced his ruling on Billy's motion to reconsider from the bench. That order was reduced to writing and entered on May 22, 2023, with a copy of the transcript of the chancellor's ruling from the bench attached. While some adjustments requested by Billy were made to the original order, Billy raises three issues on appeal that will be restated and addressed separately below.

## ANALYSIS

### I. Did the chancellor err as to the amount of child support he ordered Billy to pay Julie?

¶4. The award of child support is governed by the statutory guidelines set forth in Mississippi Code Annotated section 43-19-101 (Supp. 2022). Pursuant to section 43-19-101(1), there is a "rebuttable presumption" that the amount of child support due for two

---

[1] Prior to the trial, the parties also had agreed for Julie to have physical custody of the children with visitation for Billy and that the parties would share joint legal custody. For purposes of this appeal, matters to be decided by the chancellor were the amount of child support and the equitable distribution of the marital property.

children is twenty percent of the non-custodial parent's monthly adjusted gross income. Pursuant to section 43-19-101(2), the percentage should be applied unless the chancellor "makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Section 43-19-103." The method for calculating gross income and the amount of the monthly "adjusted gross income" is set forth in section 43-19-101(3). In order to properly apply the statutory guidelines for child support, the chancellor must first determine the monthly adjusted gross income of the non-custodial parent. *Leblanc v. Leblanc*, 271 So. 3d 494, 503 (¶43) (Miss. Ct. App. 2018). If the chancellor errs in his calculation of the non-custodial parent's adjusted gross income or monthly adjusted gross income, we are required to reverse and remand the issue to the chancery court for the chancellor to recalculate before applying the statutory percentage. *Id.*; *Sellers v. Sellers*, 22 So. 3d 299, 308 (¶31) (Miss. Ct. App. 2009).

¶5.     In the final judgment, the chancellor based his award of child support upon Billy's "net monthly pay" of $6,939.73 as shown on Billy's Rule 8.05 financial statement, UCCR 8.05, which had been filed prior to trial on November 9, 2022.[2] The chancellor then found that according to the statutory guidelines for two children, twenty percent of that monthly adjusted gross income would be $1,388 per month and ordered that Billy pay Julie $1,350 per month in child support. The chancellor further found that because Billy had agreed that

_____

[2] To obtain this figure, the chancellor clearly included a $1,827 per diem paid to Billy when he worked for Turner Industries from August 1, 2022, through August 28, 2022, at its Fayette, Alabama location.

his children should remain at Parklane Academy, Billy should pay Parklane Academy $400 per month to be applied toward their tuition. In addition, Billy would also be responsible for one-half of "any and all enrollment fees, activity fees, and any fees for athletic, summer or school activities."[3]

¶6.    Despite Billy's testimony concerning his employment and earnings, particularly during 2022, the chancellor made no findings in the final judgment as to why it was appropriate to use the "net monthly income" figure from Billy's Rule 8.05 financial statement as his monthly "adjusted gross income" in determining the amount of child support under the guidelines. Further, the chancellor made no findings pursuant to Mississippi Code Annotated section 43-19-103 (Rev. 2021) as to why any deviation from the statutory guidelines would be necessary in this case.

¶7.    In his "Motion to Reconsider, Alter or Amend Final Judgment," Billy asked the chancellor to reconsider the $1,350 amount of child support plus the $400 amount of tuition for private school. At the hearing on the motion, Billy's counsel argued:

---

[3] In *McGovern v. McGovern*, 372 So. 3d 138 (Miss. Ct. App. 2023), a father challenged a similar child support award related to private school attendance that failed to place a specific amount the father was obligated to pay. *Id*. at 142, 145 (¶¶3-6, 25). The father argued on appeal that the award of all costs for the attendance at a private school would exceed the child support guidelines. *Id*. at 144 (¶19). This Court stated:

> The chancery court's order was not clear and not "complete" within itself. Therefore, we reverse and remand this issue back to the chancery court to reconsider the children's school tuition and additional costs and to order child support after consideration of those findings.

*Id*. at 145 (¶25).

The child support as set requires an adjusted gross income of $80,000. The record contains all income Mr. Chapman made in the year of 2022, as well as, all income that Mr. Chapman made his entire life through the submission of the Social Security form that reflects all reportable income since birth. At no time was there an adjusted gross income of $80,000.

The testimony was the type work that Mr. Chapman had engaged in required short term periods of time followed by periods of time with no employment and often incurring additional expenses to work in remote areas or out of state. The testimony was clear that even to obtain these jobs that require travel, historically, Mr. Chapman had to rely upon the income and funds donated by his parents.

When combined, looking at the $400.00 plus the $1,350.00, the child support and tuition obligation clearly exceeds his historical earning production, and it sets him up in a manner that he is absolutely unable to comply and is continuing the decisions of living beyond their income limits.

¶8.    At the conclusion of the hearing on Billy's motion, the chancellor ruled in part:

However, based upon the fact that Mr. Chapman's income does exceed Ms. Chapman's income and based on the fact that I believe his potential earnings is way greater than what he has made. It appeared that- - let me just say this, it appeared to this Court that his earning capacity was such that he had that he could make more money than he is making even at this point, but it appears that there is something that is holding him back. He, himself--he is either holding himself back, or he is having trouble getting along with people at a job. I don't know what it is, but his potential is there.
. . . .

The Court has considered the child support payment and the Court feels like it made a good solid ruling on the amount of money that Mr. Chapman makes.

Again, this Court feels like he is underachieving in several jobs. That he should be able to make more money than what he is making if he would continue to work. Both parties testified that we want these children to continue to be at Parklane Academy. That wasn't even a question. So, anything that deals with Parklane Academy and the child support, the amount of child support being payable will remain as it is at this time at $1,350.00. Parklane tuition will remain as stated within the order.

¶9.    According to Billy's testimony and the exhibits supporting his testimony that were

5

uncontradicted, Billy's Rule 8.05 financial statement represented only one month of his employment in 2022. Based upon Billy's testimony and the exhibits admitted into evidence, Billy's Rule 8.05 financial statement, which had been completed with the assistance of a CPA, was clearly wrong.[4] When dealing with a problematic Rule 8.05 financial statement, the supreme court stated in *Collins v. Collins*, 112 So. 3d 428, 433 (¶17) (Miss. 2013):

> The chancellor's concern with the document is justified. In fact, we have stated that failure to comply with Rule 8.05 constitutes a fraud on the court. *See Trim v. Trim*, 33 So. 3d 471 (Miss. 2010). However, if the chancellor makes such a finding, the appropriate remedy for such behavior is to hold Perry in contempt and enter appropriate sanctions—not to punish him by disregarding any other credible evidence provided by him to the court. See Uniform Chancery Court Rule 8.05 ("The failure to observe this rule, without just cause, shall constitute contempt of Court for which the Court shall impose appropriate sanctions and penalties"). Rule 8.05 allows evidentiary discovery in addition to the disclosure. *Id*. **In short, errors or omissions in the form do not preclude consideration of other evidence presented to the chancellor.** We therefore find that the chancellor was manifestly wrong when she arbitrarily determined Perry's monthly income to the exclusion of the undisputed evidence he provided.

(Emphasis added). As will be discussed below, based upon the evidence at trial, the chancellor clearly erred in relying upon the financial statement's net pay figure in calculating Billy's 2022 monthly adjusted gross income. In *Myles v. Lewis*, 388 So. 3d 598, 608 (¶22) (Miss. Ct. App. 2024), this Court explained:

> First, it is important that the trial court consider all evidence concerning income and expenses that the parties present. This was critical in *Collins v. Collins*, 112 So. 3d 428 (Miss. 2013). . . . The supreme court found that the chancery court was "manifestly wrong when she arbitrarily determined [the

---

[4] There is no explanation in the record as to why Billy's attorney and CPA allowed the Rule 8.05 financial statement to be filed based upon only one month's income from only one of the seven jobs from which Billy received income during 2022.

husband's] monthly income to the exclusion of the undisputed evidence he provided." *Id*. at (¶17). The supreme court held that "credible evidence related to [the husband's] heating and air conditioning business was ignored" and, for this and other reasons, the case was reversed and remanded for a new calculation of the husband's income. *Id*. at 434 (¶20).

¶10. The testimony at trial showed that Billy did not finish high school and has been unable to obtain a GED. He has worked as a pipe fitter and combo welder but holds no special certifications in those areas. According to his testimony, except for a period of fourteen years when he worked for Fabricated Pipe in Fernwood, Mississippi, his employment has been with numerous different employers on short-term projects. When these projects were completed, he would be laid off and forced to look for another job. Exhibits to his testimony included his FICA (pre-tax) earnings history that showed the following:

| 1997 | $562.89 | 2004 | $30208.15 | 2010 | $46197.62 | 2016 | $66161.19 |
|---|---|---|---|---|---|---|---|
| 1998 | $523.88 | 2005 | $34497.64 | 2011 | $43818.04 | 2017 | $52500.66 |
| 1999 | $5658.12 | 2006 | $41049.25 | 2012 | $50754.54 | 2018 | $49497.15 |
| 2000 | $15867.74 | 2007 | $44932.90 | 2013 | $56560.37 | 2019 | $48211.37 |
| 2001 | $16458.67 | 2008 | $50460.13 | 2014 | $70828.75 | 2020 | $38084.00 |
| 2002 | $24535.28 | 2009 | $52509.78 | 2015 | $67737.42 | 2021 | $30265.51 |
| 2003 | $25083.86 | | | | | | |

¶11. Billy also testified as to his employment during 2022. He worked for Smith's Machine and Welding from January 1 to 31, 2022. He was paid $19.50 per hour as a welder. He was apparently fired because he was cooking deer sausage on the job site in an "outdoor redneck crock pot." His gross earnings from this employer in 2022 was $1,755.

¶12. Then, from February 13 to March 25, 2022, he worked through TempStaff at Peppers Machine and Welding making $17 per hour. This was a ninety-day job, and he was told he would not be kept on after that period because they "didn't have room" to keep him

employed. His gross earnings from this employer in 2022 was $3,950.39.

¶13.    Billy left Peppers and took a higher paying ninety-day job, from March 28 until June 26, 2022, with Universal Plant Service in Plaquemine, Louisiana, making $38 per hour. At the end of those ninety days, he was laid off. Billy testified that he went back to work for Universal Plant Service, this time in Pasadena, Texas. He worked for $42 per hour from October 17 until November 13, 2022, at which point he was again laid off.  Billy's gross earnings, from this employer in 2022, excluding his per diem, was $40,899.06.

¶14.    From June 27 until July 15, 2022, Billy worked for Optimal Field Services in Geismar, Louisiana, at a rate of $45 per hour. He was laid off along with other people. His gross earnings from this employer in 2022 was $3,240.00.

¶15.    From August 1 until August 28, 2022, Billy worked for Turner Industries in Fayette, Alabama. He was hired as a welder making $34 per hour. He was terminated from this job when he would not move to a lesser-paying pipe fitter job. *Billy's Rule 8.05 financial statement was based solely upon this job that he held for only one month*. His gross income from this employer in 2022 was $7,531, excluding his per diem.

¶16.    Billy began work for Andy's Welding Service in Magnolia, Mississippi, as a contract labor/welder for $20 per hour on November 18, 2022, and was still working there when he testified on December 16, 2022. The documents introduced show that Billy was paid a total of $1,500 by this employer in 2022 to the point of trial.

¶17.    Nothing in the record indicates that the chancellor made any effort to calculate Billy's gross income for 2022, which according to the evidence would have been approximately

$58,875.45. His net pay, or adjusted gross income, for 2022 was approximately $44,303.51.[5]

Using Billy's actual gross income for 2022, his monthly adjusted gross income would have been $3,691.96, substantially lower than the $6,939.73 used by the chancellor.

¶18.    The exhibit showing Billy's FICA earnings reveals that 2022 would have been Billy's fourth highest annual gross income since he was seventeen years old. It was his highest gross income since 2016. It is clear from the FICA records that Billy's earnings have fluctuated. Further, his testimony shows that his hourly rate of pay differed greatly in the seven different jobs he had just during 2022. In *Roberts v. Roberts*, 924 So. 2d 550, 553 (¶5) (Miss. Ct. App. 2005), this Court stated:

> Mr. Roberts was a pharmaceutical salesman, with a fluctuating income. Because Mr. Roberts' income fluctuated, the chancery court used a three-year income average to determine the applicable amount of child support. Where income tends to fluctuate, a chancellor may use income averaging to calculate applicable child support. In *Burge v. Burge*, 851 So. 2d 384 (¶¶5-8) (Miss. Ct. App. 2003), we upheld the use of averages for fluctuating income as acceptable.

¶19.    Section 43-19-101(3)(a) instructs the chancellor to "[d]etermine gross income from all potential sources that may reasonably be expected to be available to the absent parent . . . ." Generally, this is done by looking at present circumstances and/or historical earnings. In the present case, the chancellor did not calculate Billy's monthly adjusted income using his gross earnings in 2022. He did not consider the use of income averaging.

¶20.    In the original order, the chancellor simply used the "net pay" figure from the Rule

---

[5] It is unclear from the three pay stubs in the record from Andy's Welding Service whether they represent gross or net pay amounts.

8.05 financial statement without further comment. On the motion for reconsideration, the chancellor found that Billy had the potential to earn more money than he was earning. While we recognize that the chancellor "can base child support on the parent's potential earning capacity," his finding must be supported by substantial evidence. *Pace v. Pace*, 324 So. 3d 369, 377-78 (¶¶29-30) (Miss. Ct. App. 2021); *see also Swiderski v. Swiderski*, 18 So. 3d 280, 286-87 (¶¶27-28) (Miss. Ct. App. 2009). There is no substantial evidence to support the chancellor's determination that Billy's monthly adjusted income in this case is $6,939.73.

¶21.    Further, the figure the chancellor used as Billy's monthly adjusted gross income included a per diem in the amount of $1,827, which Billy received while he was working for Turner Industries in Alabama.[6] Any per diem Billy received from working "traveling jobs" should be deducted from Billy's adjusted gross income. *See Wallace v. Wallace*, 965 So. 2d 737, 741-48 (¶¶9-46) (Miss. Ct. App. 2007).

¶22.    We also find that even using the monthly adjusted gross income of $6,939.73, the award of $1,350 in child support plus the payment of $400 monthly for private school tuition exceeds the twenty-percent guideline for two children. "The guidelines are, however, merely guidelines, and they 'do not control per se the amount of an award of child support.'" *Gunter v. Gunter*, 281 So. 3d 283, 286 (¶10) (Miss. Ct. App. 2019) (quoting *Clausel v. Clausel*, 7144 So. 2d 265, 267 (¶8) (Miss. 1998)). The chancery court "has special knowledge of the actual circumstances," so "a departure is permissible when the chancery court mak[es] a written

---

[6] In any event, that per diem figure on the Rule 8.05 financial statement was wrong. The final pay stub included in the record shows that the total per diem Billy received from Turner Industries was $1,700.

finding on the record that the application of the guidelines would be unjust or inappropriate." *Id*. (quoting *Dunn v. Dunn*, 695 So. 2d 1152, 1155 (Miss. 1997)). **Private school tuition costs should be treated as a part of child support and should not be "calculated separately from and in addition to the support award."** *Id*. at (¶11) (emphasis added) (citing *Southerland v. Southerland* (*Southerland I*), 816 So. 2d 1004, 1006 (¶11) (Miss. 2002)). "Even where parents agree to send children to private school, support awards made in consideration of this expense must also be reasonable in light of both parents' financial means." *Southerland I*, 816 So. 2d at 1006 (¶11). The Mississippi Supreme Court has upheld a chancellor's order requiring a father to pay private school tuition where the chancellor made requisite findings under Mississippi Code Annotated section 43-19-101(2) and (4) and found he was "able to meet the expense" financially. *Southerland v. Southerland* (*Southerland II*), 875 So. 2d 204, 207 (¶8) (Miss. 2004).

¶23.   Section 43-19-103 provides:

> The rebuttable presumption as to the justness or appropriateness of an award or modification of a child support award in this state, based upon the guidelines established by Section 43-19-101, may be overcome by a judicial or administrative body awarding or modifying the child support award by making a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined according to the following criteria:
>
> (a) Extraordinary medical, psychological, educational or dental expenses.
> (b) Independent income of the child.
> (c) The payment of both child support and spousal support to the obligee.
> (d) Seasonal variations in one or both parents' incomes or expenses.
> (e) The age of the child, taking into account the greater needs of older children.
> (f) Special needs that have traditionally been met within the family budget even though the fulfilling of those needs will cause the support to exceed the proposed guidelines.

(g) The particular shared parental arrangement, such as where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent, or the refusal of the noncustodial parent to become involved in the activities of the child, or giving due consideration to the custodial parent's homemaking services.

(h) Total available assets of the obligee, obligor and the child.

(i) Payment by the obligee of child care expenses in order that the obligee may seek or retain employment, or because of the disability of the obligee.

(j) Any other adjustment which is needed to achieve an equitable result which may include, but not be limited to, a reasonable and necessary existing expense or debt.

¶24. We find nothing in the record to show that the chancellor considered the requirements of section 43-19-103 in determining whether a deviation from the child support guidelines was appropriate in this case for the payment of private school tuition, fees, and expenses. The chancellor's finding that Billy agreed that the children should stay in private school is insufficient to support a deviation from the guidelines. We have held that "[w]hile a father's agreement prior to divorce to send a child to private school may be one legitimate factor to be considered, it is by itself an inadequate basis for an award of support in excess of that allowed by the statutory guidelines." *Southerland I*, 816 So. 2d at 1007 (¶13).

¶25. Because we find that the chancellor erred in his calculation of Billy's monthly adjusted gross income, we reverse and remand the case to the chancery court for recalculation consistent with this opinion.[7] Once that amount is determined, should the award of child support, including private school tuition and expenses, exceed twenty percent, the chancellor should make sufficient findings pursuant to section 43-19-103 to support any such

---

[7] The chancellor should cite the evidence to support whatever he determines Billy's monthly adjusted gross income to be if he determines such figure based on Billy's potential earning capacity.

12

deviation.

## II. Was the chancellor's equitable division of assets made in error that constitutes reversible error?

¶26. In *Garner v. Garner*, 343 So. 3d 1097, 1103-04 (¶¶31-33) (Miss. Ct. App. 2022), we

explained:

> "It is within the chancery court's authority to make an equitable division of all jointly acquired real and personal property." *Norwood v. Norwood*, 305 So. 3d 175, 178 (¶11) (Miss. Ct. App. 2020). "This Court reviews a chancery court's division of marital assets for an abuse of discretion." *Id*. "We will not reverse a chancery court's distribution of assets absent a finding that the decision was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id*.

> "When dividing marital property, chancellors are to (1) classify the parties' assets as marital or separate; (2) determine the value of those assets; (3) divide the marital estate equitably . . . ; and (4) consider the appropriateness of alimony if either party is left with a deficiency." *Faerber v. Faerber*, 150 So. 3d 1000, 1005 (¶12) (Miss. Ct. App. 2014). From there, the chancery court must apply the *Ferguson* factors, which include: "(1) contribution to the accumulation of the marital property; (2) dissipation of the assets; (3) the market or emotional value of assets subject to distribution; (6) the extent to which property division may eliminate the need for alimony; (7) the financial security needs of the parties; and (8) any other factor that in equity should be considered." *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

> "Equitable distribution does not require equal distribution." *Spahn v. Spahn*, 959 So. 2d 8, [14] (¶14) (Miss. Ct. App. 2006). "Rather, equitable distribution is a fair division of marital assets during the marriage." *Id*.

¶27. In the original order, the chancellor listed all the parties' personal property assets and

found that Billy's interest was $15,775 greater than Julie's interest. The chancellor ordered

Billy to pay Julie $438.19 per month for thirty-six months to make the division of assets

equal. On reconsideration, the chancellor re-adjusted the parties' equitable interests and

found that Julie actually had $20,601.64 more in assets than Billy. The chancellor noted that

13

half that figure was $10,300.82, but he was not going to require Julie to pay Billy his half of the equity. The chancellor explained that ruling:

> There was also a request made for alimony which the Court did not approach in the opinion. However, based on the fact that Mr. Chapman's income does exceed Ms. Chapman's income and based on the fact that I believe his potential earnings is way greater than what he has made. It appeared that -- let me just say this, it appeared to this Court that his earning capacity was such that he had that he could make more money than he is making even at this point, but it appears that there is something that is holding him back. He himself -- he is either holding himself back, or he is having trouble getting along with people at a job. I don't know what it is, but his potential is there.
>
> So, anyway, the Court is not going to require Ms. Chapman to pay $10,300.82 to Mr. Chapman. That will be the plus that she will receive in her plus column.

Billy argues that the "record is void of any substantial evidence before the court that [Billy] [was] purposefully limiting his earning capacity" and that the ruling constitutes an abuse of discretion. Julie argues that since the chancellor seemed to believe Billy could not pay alimony, he used the $10,300.82 forgiveness to offset the need for alimony.

¶28. Billy also takes issue with the chancellor's inclusion in his equity column of a boat listed on both parties' Rule 8.05 financial statements. The chancellor stated:

> The ski boat, there is no disagreement that the ski boat is in the name of Mr. Chapman. There was verbal testimony that his mother had paid for that ski boat, but they had made no arrangements to repay it. This Court has considered in several different ways, one, being a gift.
>
> The Court did not hear enough evidence to give him any credit for any payments that he would be making back to his mother. So, the ski boat or bass boat or whatever it is will remain as the equity as set out in the Order.

Both Billy and Julie acknowledged that Billy's parents had purchased the boat and both testified that they were supposed to make payments when they could but had failed to do so.

14

There was no testimony that the boat was a gift.

¶29.  Billy's argument at reconsideration and on appeal is that if a boat is listed as a marital asset, the corresponding debt also should have been considered but was not. Billy contends that if it were considered a gift to him, it should not have been included as a marital asset. If the value of the boat were removed, Billy's portion of the marital personal property distribution, the difference between Billy's interests and Julie's interest, would increase to $29,301.64.

¶30.  If the chancellor found the boat to be a gift to Billy, it was error for him to subject that to equitable distribution. "[P]roperty that is 'clearly obtained by one spouse through gift or inheritance is nonmarital property not subject to equitable distribution.'" *Davidson v. Davidson*, 369 So. 3d 607, 613 (¶16) (Miss. Ct. App. 2023); *see also Neely v. Neely*, 305 So. 3d 164, 168 (¶13) (Miss. Ct. App. 2020) (Property acquired as an inter vivos gift "is separate property, even if such property is acquired during the marriage." (quoting *Rhodes v. Rhodes*, 52 So. 3d 430, 441 (¶40) (Miss. Ct. App. 2011))). If the chancellor found it to be marital property, the debt to Billy's parents should have been included.

¶31.  In *Carter v. Carter*, 98 So. 3d 1109, 1114-15 (¶18) (Miss. Ct. App. 2012), this Court held:

> The change in one financial award or obligation changes the "entire field" of the financial settlement in a divorce judgment. *Rhodes v. Rhodes*, 52 So. 3d 430, 450 (¶82) (Miss. Ct. App. 2011) (quoting *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶13) (Miss. 2003)). Because we find the $11,000 credit to be clearly erroneous, we reverse and remand the entire equitable distribution for the chancellor to reconsider. *See id.* (holding an error in classification of marital asset required remanding all financial aspects of divorce judgment, including alimony). On remand, the chancellor is not bound to divide the debt equally

15

and apply a $4,000 credit. Rather, the chancellor must again apply the *Ferguson* factors, in light of William's and Linda's nonmarital property, to divide the property and debt equitably. *See Lauro*, 847 So. 2d at 848 (¶13) (quoting *Johnson* [*v. Johnson*], 650 So. 2d [1281,] 1287) [(Miss. 1994)]). He should also consider alimony, should there be a deficit. *See id*.

Because the chancellor erred in his judgment concerning the treatment of the boat, we must reverse and remand all financial aspects of the Chapmans' divorce judgment.

## CONCLUSION

¶32.   Because we find that the chancellor erred in his calculation of Billy's monthly adjusted gross income and erred concerning whether the boat is marital or non-marital property, we reverse and remand these matters to the chancery court for further consideration consistent with this opinion.

¶33.   **REVERSED AND REMANDED.**

**BARNES, C.J., McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., AND WESTBROOKS, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WEDDLE, J., NOT PARTICIPATING.**