# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00087-COA

**LAURA J. CHAMBLISS**                                                    **APPELLANT**

**v.**

**CHAD ERIC CHAMBLISS**                                                  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/29/2022 |
| TRIAL JUDGE: | HON. DEBORAH J. GAMBRELL |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM E. ANDREWS III |
| ATTORNEY FOR APPELLEE: | SHAWN M. LOWREY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/07/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Chad Chambliss and Laura Chambliss married on August 15, 1987. They divorced after nine years; however, they began living with each other two months later. They eventually remarried on May 10, 2011. Eleven years later, they separated, and Laura filed for divorce. On November 10, 2022, the Lamar County Chancery Court entered a judgment granting a divorce to Laura on the ground of adultery. The court ordered Chad to pay Laura thirty percent of his Merrill Lynch retirement account and $1,800 per year for twelve years to allow her to purchase health insurance. The court also ordered Chad to pay $3,500 toward Laura's attorney's fees. On appeal, Laura contends that the chancellor erred by not awarding her (1) any portion of Chad's two other investment accounts; (2) the amount of the distribution of the Merrill Lynch account; (3) alimony; and (4) sufficient attorney's fees.

Finding no error, we affirm the chancery court's final judgment.

## FACTS AND PROCEDURAL HISTORY

¶2.     After Laura and Chad were married, they welcomed their first child in March 1988. They divorced based on irreconcilable differences on December 12, 1996, and spent two months apart. Eventually they reconciled and began living with each other again in 1997. They welcomed their second child in March 1998. Laura and Chad decided to remarry on May 10, 2011. They testified that one of the reasons they got remarried was to get Laura on Chad's health insurance that was offered through his employer.

¶3.     Chad provided the primary source of income in the family. Both he and Laura admitted that he paid for all the family expenses. In addition to being responsible for all expenses, Chad also made some investments. From 1996 to 2011, Chad created and contributed to two separate retirement accounts with AIG and BancorpSouth. These accounts had a value of $91,598.41 and $40,922.26, respectively. Their growth was completely passive after 2011. Chad created and contributed to another retirement account with Merrill Lynch after he and Laura remarried in 2011. This account had a value of $204,863.58.

¶4.     Laura was responsible for taking care of the children and maintaining the home. Chad testified that she did little cleaning and that his mother helped take care of the children. Laura was also responsible for tending to the farm animals that they owned on their property. Laura testified that she attempted to go back to school in 2005, but she never completed the degree and incurred around $17,000 in student loan debt. Laura further testified that the last

time she was employed was in 2008 when she worked for a table-cloths servicer for restaurants and businesses owned by Kim Bradley. She claimed that Chad did not allow her to have a job. Chad testified that he tried to get her to work after the children were grown, but she refused to get a job.

¶5. Laura claimed that she could no longer work because of rheumatoid arthritis, degenerative arthritis in her spine, neuropathy that affects her balance, and ruptured disks in her back. She had two surgeries on her back and claimed that she would need another back surgery due to a chipped bone. She had also had two surgeries on her vocal cords. She claimed that she received therapy for her balance and had to take medications for her different ailments. Despite all these purported medical issues, there was no testimony from a physician to support these claims, and Laura's attorney admitted during trial that "[s]he does not qualify for disability of any sort."

¶6. Laura admitted that she used marijuana to help with the pain in her joints. She testified that she received money from Chad every week to purchase marijuana, and she smoked four to five nights out of the week. She said that she had been using it ever since she first met Chad. Chad testified that her marijuana use caused difficulties in their marriage. He said, "[S]he always wanted to go smoke and sit on the porch with married men and her friends . . . . I didn't like it." He also claimed that she misspent marital assets due to her smoking habit. Laura was not prescribed to use marijuana by a physician. She claimed her physician referred her to a medical marijuana specialist; however, it would be months before the specialist could assess her for a medical marijuana prescription.

3

¶7. After eleven years of marriage, Laura and Chad separated on January 10, 2022. Chad testified that two to three years before the separation, they "couldn't get along" and were "fighting and fussing." He also testified that he was often away from home because his job stationed him in Yazoo City. He claimed that he only came home on weekends to see his grandchildren, and he slept on the couch while he was there.

¶8. Laura, on the other hand, testified that the reason they separated was because Chad began having a relationship with another woman. Laura claimed that she knew about their relationship for a while, but she could never find proof until Chad and his girlfriend created a joint Facebook account showcasing their relationship. Laura filed her complaint for divorce on March 28, 2022, alleging that she was entitled to a divorce on the grounds of habitual cruel and inhuman treatment, abandonment, desertion, and adultery. In her complaint, Laura requested temporary relief to assist her until a trial on the merits was held.

¶9. The court entered a temporary order on June 13, 2022. In the order, the court established the date of demarcation for the estate assets as June 2, 2022. The court ordered Chad to pay Laura $1,200 monthly in spousal support and to continue paying her health and car insurance. The court also ordered Laura and Chad to divide their checking and savings accounts at BancorpSouth. Chad filed his answer to the complaint on October 13, 2022.

¶10. The trial was held on October 18, 2022. At the conclusion of the trial, the court took the matters under advisement. On November 10, 2022, the court entered its "Findings of Fact, Conclusions of Law, Opinion and Final Judgment." In this order, the court acknowledged that Chad admitted to adultery and granted Laura a divorce based on that

4

ground. The court also acknowledged Laura's dissipation of assets due to her marijuana use and Chad's testimony about it causing problems in their marriage and resulting in their last separation. The court took this evidence into consideration and found that Chad was entitled to seventy percent of the Merrill Lynch retirement account ($139,282.92), and Laura was entitled to thirty percent ($59,692.68). The court found that the value of their personalty was $98,377, and Laura was entitled to fifty percent of it. Additionally, due to Laura's health conditions and the disparity in their incomes, the court ordered Chad to pay Laura $1,800 per year for twelve years to allow her to purchase health insurance and $3,500 toward her attorney's fees. Lastly, the chancellor declined to award her alimony because she had divided the assets such that alimony was not necessary.

¶11. Laura filed a "Motion to Reconsider, Alter or Amend Final Judgment" on November 15, 2022. The court then entered an "Order Clarifying in Part the Findings of Fact, Conclusions of Law, Opinion and Final Judgment" on December 29, 2022. In this order, the court denied Laura's motion and provided more in-depth findings for why the AIG and BancorpSouth IRA accounts were non-marital and not entitled to an equitable distribution. Laura filed a notice of appeal on January 23, 2023.

## STANDARD OF REVIEW

¶12. "This Court employs a limited standard of review of property division and distribution in divorce cases." *Parrish v. Parrish*, 245 So. 3d 519, 522 (¶5) (Miss. Ct. App. 2017). "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused [her] discretion, was manifestly wrong, clearly erroneous or an

5

erroneous legal standard was applied." *Sanderson v. Sanderson*, 824 So. 2d 623, 625-26 (¶8) (Miss. 2002). "We do not substitute our 'judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion.'" *Rhodes v. Rhodes*, 52 So. 3d 430, 435 (¶15) (Miss. Ct. App. 2011) (quoting *Coggin v. Coggin*, 837 So. 2d 772, 774 (¶3) (Miss. Ct. App. 2003)).

¶13. "A trial judge's award of attorneys' fees is reviewed under the abuse of discretion standard, and the award of attorneys' fees must be supported by credible evidence." *McNeese v. McNeese*, 119 So. 3d 264, 274 (¶26) (Miss. 2013). "Alimony awards are also within the sound discretion of the chancellor." *Reynolds v. Reynolds*, 287 So. 3d 1019, 1023 (¶7) (Miss. Ct. App. 2019) (citing *Speed v. Speed*, 757 So. 2d 221, 224 (¶6) (Miss. 2000)). "In matters that are questions of law, [appellate courts] employ a de novo standard of review and will only reverse for an erroneous interpretation or application of the law." *Morgan v. West*, 812 So. 2d 987, 990 (¶8) (Miss. 2002).

## I. Non-marital Assets (AIG and BancorpSouth Accounts)

¶14. Laura argues that the chancellor erred by not awarding her any portion of Chad's AIG and BancorpSouth IRA accounts. Chad and Laura were not married during the years Chad made contributions to these accounts; however, Laura argues that she is entitled to an equitable distribution of these accounts because she and Chad were previously married and continued living together after the divorce. We disagree.

¶15. Equitable distribution "is committed to the discretion and conscience of the [c]ourt, having in mind all of the equities and other relevant facts and circumstances." *Chamblee v.*

6

*Chamblee*, 637 So. 2d 850, 864 (Miss. 1994) (quoting *Brown v. Brown*, 574 So. 2d 688, 691 (Miss. 1990)). "According to this Court's ruling in *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994), the first step before division of the assets is for the chancellor to characterize the parties' assets as marital or non-marital." *Craft v. Craft*, 825 So. 2d 605, 608 (¶11) (Miss. 2002). Marital property is defined as "any and all property acquired or accumulated during the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994). Non-marital property are assets "attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Id*. at 914. "The second step is for the chancellor to equitably divide the marital property according to the guidelines set forth in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss.1994)." *Craft*, 825 So. 2d at 608 (¶11).

¶16. It is undisputed that Chad contributed to the AIG and BancorpSouth accounts from 1996 until 2011, when Chad and Laura were not married but living together. After they remarried in 2011, these accounts grew passively, and Chad did not actively make any further contributions. The only account that was contributed to during the second marriage was the Merrill Lynch account.

¶17. Laura is essentially arguing that their remarriage restores all assets acquired during their cohabitation back into the marital estate. In efforts to bolster her claim, Laura cites four different cases: *Chrismond v. Chrismond*, 211 Miss. 746, 52 So. 2d 624 (1951); *Taylor v. Taylor*, 317 So. 2d 422 (Miss. 1975); *Rasch v. Rasch*, 250 Miss. 885, 168 So. 2d 738 (1964); and *Pickens v. Pickens*, 490 So. 2d 872 (Miss. 1986). None of these cases are applicable here.

¶18.    *Chrismond*[1] involved a married couple that maintained a profitable business through their joint efforts and accumulated a substantial amount of property. *Chrismond*, 52 So. 2d at 625.  The wife filed for divorce and sought a division of the marital property. *Id*.  The court found that the marriage was actually void because the husband had failed to divorce his former wife. *Id*. at 627.  The court determined that despite the fact that the marriage was putative, the wife was still entitled to an equitable division of the property that was accumulated through their joint efforts.  *Id*. at 629.  *Taylor* also dealt with a void marriage. *Taylor*, 317 So. 2d at 422.  The wife had a previous marriage that was never dissolved. *Id*. The husband was aware of the putative marriage; nevertheless, they remained married for eighteen years before filing for divorce. *Id*. at 423.  The Supreme Court found that the wife was entitled to alimony regardless of the validity of the marriage. *Id*.

¶19.    *Chrismond* and *Taylor* specifically addressed putative marriages, and in both cases, the court fashioned an equitable remedy for cases dealing with those circumstances.  Those circumstances are not present in the case at hand.  Laura and Chad entered into a valid marriage both the first and second times they married.  During their period of cohabitation prior to the second marriage, they both were aware that they were living together without the benefits of marriage.

¶20.    *Rasch* dealt with a married couple that got a divorce after welcoming a child. *Rasch*, 168 So. 2d at 739.  The mother was granted full custody, and the father was granted visitation

---

[1] We note that *Chrismond* was decided when common law marriages were still recognized in Mississippi.  These marriages were no longer permitted after 1956. Miss. Code Ann. § 93-1-15 (Rev. 2021).

8

and had to pay child support. *Id*. at 740. Not long after the divorce, the couple resumed living together. *Id*. at 741. Eventually there was another separation, and the mother petitioned the court to hold the father in contempt for failing to make child support payments. *Id*. The Supreme Court held that the resumption of marital relations restores parental rights and dissolves the obligation to make monthly child support payments. *Id*. at 744. Laura contends that this same principle should apply to annul divorces when couples resume living together. This argument fails on its face. *Rasch* is both factually and legally distinguishable from this case, and its application is limited to cases involving custody disputes.

¶21. Lastly, *Pickens* involved a couple who resumed living with each other a year after their divorce. *Pickens*, 490 So. 2d at 873. Remarriage was discussed, but it never materialized. *Id*. It is noteworthy that both the husband and wife were employed and made significant financial contributions to their property accumulation when they were living together unmarried. *Id*. at 874. Based on this finding, the Supreme Court was inclined to treat their relationship like a business partnership and treated their separation like a partnership dissolution. *Id*. at 876. This rationale justified an equitable distribution of the parties' assets. *Id*. In the present case, there was no joint effort in the accumulation of property that would allow the court to treat Chad and Laura's cohabitation like a business partnership. Before and after their remarriage, Laura made little to no financial contributions. The AIG and BancorpSouth accounts were accumulated through the sole efforts of Chad.

¶22. There is simply no support for the assertion that cohabitation vests marital rights in

9

parties who were previously married. Furthermore, there is no law to suggest that even if the divorce were revoked or "set aside," as the trial court intimated,[2] that the revocation would nullify the divorce decree or relate back to the end of the first marriage. The chancellor found that they "willingly and knowingly lived together without the benefit of marriage." The AIG and BancorpSouth retirement accounts were created and contributed to during this period of cohabitation. Accordingly, Laura is not entitled to an equitable division of the non-marital accounts. This issue has no merit.

## II.      Marital Asset (Merrill Lynch Account)

¶23.    Laura argues that the chancellor erred by awarding her only thirty percent of the Merrill Lynch retirement account. She claims that this was an insufficient amount and that she is entitled to more because she only "has $41,688.00, her car, $59,692.68 from the Merrill funds (which is subject to income taxes) and no income." When determining an equitable division of marital assets, the chancellor must examine the *Ferguson* factors. *Carney v. Carney*, 201 So. 3d 432, 440 (¶27) (Miss. 2016). These factors include:

> (1) Substantial contribution to the accumulation of the property . . . [;]
>
> (2) The degree to which each spouse has expended, withdrawn or otherwise

---

[2] In her bench opinion, the chancellor stated:

> [O]ur legislature promulgated certain rules that say if you secure a divorce on an irreconcilable difference basis and you decide that you reconcile and you want to get back together, you petition the court and ask the court to set side that divorce. And if there have been no intervening marriages, like you-all had gone out and married other people, or had other children, then the court can look at it as a continuous, like, marriage. You-all didn't opt to do that. What you-all did was you secured a regular divorce, an ID divorce, though, but you went back and remarried and didn't ask the court to set aside.

10

disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise[;]

(3) The market value and the emotional value of the assets subject to distribution[;]

(4) The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

(5) Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

(6) The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

(7) The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and

(8) Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928.

¶24.   In *Ferguson*, the Court held that "[t]he chancellor may divide marital assets, real and personal, as well as award periodic and/or lump sum alimony, as equity demands." *Id*. at 929. However, "[t]his division does not require an automatic fifty-fifty split or a vested right[.]" *Savelle v. Savelle*, 650 So. 2d 476, 479 (Miss. 1995).  "It is well settled that 'an equitable division of property does not necessarily mean an equal division of property.'" *Carney*, 201 So. 3d at 440 (¶27) (quoting *Chamblee*, 637 So. 2d at 863-64).

¶25.   "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Smith v. Smith*, 90 So. 3d 1259, 1261 (¶7)

(Miss. Ct. App. 2011). Also, "the goal as it pertains to equitable division is 'a fair division of marital property based on the facts of each case.'" *Jenkins v. Jenkins*, 67 So. 3d 5, 12 (¶13) (Miss. Ct. App. 2011). In the present case, Chad provided the primary source of income for the family. He was the sole contributor of the Merrill Lynch account. Although Laura took care of the children and the home, the chancellor found that she dissipated the marital assets by buying marijuana four to five times a week. There was also testimony from Chad that it was not true that Laura was not physically able to work; she simply refused to work. Furthermore, there was no evidence in the record to substantiate Laura's claim that she was disabled or unable to work. The chancellor carefully considered these facts and determined that Chad was entitled to a larger amount of the Merrill Lynch account. The chancellor acted within her discretion in coming to this conclusion, and we find no reversible error in her reasoning.

### III. Alimony

¶26. Laura argues that the chancellor erred by declining to award her alimony. "The decision of whether to award alimony, and if so, what amount, is left to the chancellor's discretion." *Hearn v. Hearn*, 191 So. 3d 129, 132 (¶10) (Miss. Ct. App. 2016). "The chancellor's decision will not be reversed on appeal unless he was manifestly in error in his finding of fact or abused his discretion." *Riley v. Riley*, 846 So. 2d 282, 285 (¶10) (Miss. Ct. App. 2003). "In the case of a claimed inadequacy or outright denial of alimony, we will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion." *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss.

12

1993).

¶27. "Alimony should be considered only if, after the parties assets are equitably divided, there are not 'sufficient assets to provide for both parties' and one party is left with 'a deficit.'" *Stroh v. Stroh*, 221 So. 3d 399, 412 (¶43) (Miss. Ct. App. 2017) (quoting *Carter v. Carter*, 98 So. 3d 1109, 1112 (¶8) (Miss. Ct. App. 2012)). "Where 'there are sufficient marital assets which, when equitably divided and considered with each spouse's non-marital assets, will adequately provide for both parties, no more need be done.'" *Parrish*, 245 So. 3d at 524 (¶16) (quoting *Dykes v. Dykes*, 191 So. 3d 1287, 1291 (¶24) (Miss. Ct. App. 2016)).

¶28. Here, the chancellor awarded Laura thirty percent of the Merrill Lynch retirement account ($59,692.68); fifty percent of the total value of all personalty ($49,188.50); $1,800 per year for twelve years to allow her to purchase health insurance; and $3,500 towards her attorney fees. Additionally, the chancellor ordered Chad to pay all the marital debt. In the final judgment, the chancellor found that she had "equitably divided the assets of the parties to the extent that the award of rehabilitative alimony or other form of alimony [was] unnecessary." After making this determination, it was not necessary for the chancellor to conduct an *Armstrong* analysis.

¶29. Laura argues that one of the reasons she should have been granted alimony is that she does not have any income and is unable to work. Although she produced evidence of her various medical issues, Laura failed to introduce any credible evidence to prove that these issues caused her inability to work. She offered a doctor's report, but even it stated that she claimed she was unable to do "physical work" and was "considering applying for disability."

13

Not all jobs require physical labor, and there is no evidence in the record showing that she had attempted to apply for disability benefits. Furthermore, testimony showed Laura refused to get a job despite Chad's urging her to do so. Accordingly, we find that the chancellor ruled within her discretion when she declined to award alimony.

### IV. Attorney's Fees

¶30. Laura argues that the chancellor erred by awarding her insufficient attorney's fees. The awarding of attorney's fees is left to the chancellor's discretion. *McKee. v. McKee*, 418 So. 2d 764, 767 (Miss. 1982). When determining the proper amount of an award of attorney's fees, courts must apply the *McKee* factors:

> The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

*Id*. "[T]he primary purpose of requiring the trial judge to perform the *McKee* analysis is to ensure that any award of attorney's fees that the judge may order is reasonable and supported by the evidence." *Harbit v. Harbit*, 3 So. 3d 156, 161 (¶18) (Miss. Ct. App. 2009). "When awarding attorney's fees, chancellors are instructed to make specific findings regarding the recipient's ability to pay." *Evans v. Evans*, 75 So. 3d 1083, 1089 (¶22) (Miss. Ct. App. 2011). And "where a party is financially able to pay her attorney, an award of attorney's fees [is] not appropriate." *Pacheco v. Pacheco*, 770 So. 2d 1007, 1012 (¶26) (Miss. Ct. App. 2000) (quoting *Martin v. Martin*, 566 So. 2d 704, 707 (Miss.1990)).

¶31. Laura argues the attorney's fees awarded to her were inadequate because she lacked

14

the income and financial resources to pay her attorney. The chancellor awarded her $3,500 in attorney's fees. Laura's attorney's fees totaled $13,047.50. Laura testified that she did not have any money to pay her attorney, and she had to borrow $3,500 from her friends to make a payment toward her attorney's fees. However, this was Laura's financial situation before trial. The funds that Laura received from the divorce were sufficient for her to pay the remaining balance and still have funds left over.

¶32. Additionally, when discussing attorney's fees at trial, both attorneys concluded that $250 per hour was a reasonable rate. However, Chad's attorney argued that this was not a complicated or novel case to necessitate such a large bill. In her brief, Laura argues that the issues presented were not "run-of-the-mill issues in a divorce case" because "the marriage, divorce, and remarriage present quite a different factual situation and legal issues for the court." We disagree. "An award of attorney's fees may be sufficient in a simple matter before the court, where the award is based on the court's experience and observation." *Speights v. Speights*, 126 So. 3d 76, 82 (¶19) (Miss. Ct. App. 2013). This divorce case was indeed simple, and the law is well-established in all the issues that were presented. The adultery ground was admitted to by Chad; there was not a substantial amount of personal property involved; and there was only one marital account that needed to be divided. The only issue that Laura has attempted to complicate is the division of the non-marital assets that were created and contributed to when Laura and Chad were living together, unmarried. However, as discussed above, cohabitation does not vest marital rights in parties who were previously married. Considering there is no law to support the equitable division of the

15

non-marital assets at issue, this case was simple. Accordingly, we find that the award was reasonable and well within the chancellor's discretion.

<h1 style="text-align:center">CONCLUSION</h1>

¶33. Based on our review of the record, we find no reversible error in the chancellor's findings of fact and conclusions of law. The AIG and BancorpSouth accounts were correctly classified as non-marital assets, and the "resumption" of marital relations did not entitle Laura to an equitable division of them. Thus, the chancellor did not err by declining to award Laura a portion of the AIG and BancorpSouth accounts. The chancellor acted within her discretion when she found that Laura was entitled to only thirty percent of the marital retirement account due to her dissipation of marital assets because of marijuana. The chancellor also acted within her discretion when she declined to award alimony. The distribution of marital assets was sufficient; therefore, alimony was not necessary. Lastly, we find no error in the chancellor's award of attorney's fees. Accordingly, the final judgment is affirmed.

¶34. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**